**SINCLAIR OIL CORPORATION, Defendant Below, Appellant,**

v.

**Francis S. LEVIEN, Plaintiff Below, Appellee.**

Supreme Court of Delaware,

June 18, 1971.

located directly across the street from the Railroad's freight yard.

Henry M. Canby, of Richards, Layton & Finger, Wilmington, and Paul W. Williams, Floyd Abrams and Eugene R. Scheiman of Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for appellant.

Richard F. Corroon, Robert K. Payson, of Potter, Anderson & Corroon, Leroy A. Brill of Bayard, Brill & Handelman, Wilmington, and J. Lincoln Morris, Edward S. Cowen and Pollock & Singer, New York City, for appellee.

WOLCOTT, C. J., CAREY, J., and CHRISTIE, Judge, sitting.

WOLCOTT, Chief Justice.

This is an appeal by the defendant, Sinclair Oil Corporation (hereafter Sinclair), from an order of the Court of Chancery, 261 A.2d 911 in a derivative action requiring Sinclair to account for damages sustained by its subsidiary, Sinclair Venezuelan Oil Company (hereafter Sinven), organized by Sinclair for the purpose of operating in Venezuela, as a result of dividends paid by Sinven, the denial to Sinven of industrial development, and a breach of contract between Sinclair's wholly-owned subsidiary, Sinclair International Oil Company, and Sinven.

Sinclair, operating primarily as a holding company, is in the business of exploring for oil and of producing and marketing crude oil and oil products. At all times relevant to this litigation, it owned about 97% of Sinven's stock. The plaintiff owns about 3000 of 120,000 publicly held shares of Sinven. Sinven, incorporated in 1922, has been engaged in petroleum operations primarily in Venezuela and since 1959 has operated exclusively in Venezuela.

Sinclair nominates all members of Sinven's board of directors. The Chancellor found as a fact that the directors were not independent of Sinclair. Almost without exception, they were officers, directors, or employees of corporations in the Sinclair complex. By reason of Sinclair's domination, it is clear that Sinclair owed Sinven a fiduciary duty. Getty Oil Company v. Skelly Oil Co., 267 A.2d 883 (Del.Supr. 1970); Cottrell v. Pawcatuck Co., 35 Del. Ch. 309, 116 A.2d 787 (1955). Sinclair concedes this.

The Chancellor held that because of Sinclair's fiduciary duty and its control over Sinven, its relationship with Sinven must meet the test of intrinsic fairness. The

standard of intrinsic fairness involves both a high degree of fairness and a shift in the burden of proof. Under this standard the burden is on Sinclair to prove, subject to careful judicial scrutiny, that its transactions with Sinven were objectively fair. Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503 (1939); Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 293, 93 A.2d 107, 38 A.L.R.2d 425 (Del.Supr.1952); Getty Oil Co. v. Skelly Oil Co., supra.

■ Sinclair argues that the transactions between it and Sinven should be tested, not by the test of intrinsic fairness with the accompanying shift of the burden of proof, but by the business judgment rule under which a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching. Meyerson v. El Paso Natural Gas Co., 246 A.2d 789 (Del.Ch. 1967). A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment.

■ We think, however, that Sinclair's argument in this respect is misconceived. When the situation involves a parent and a subsidiary, with the parent controlling the transaction and fixing the terms, the test of intrinsic fairness, with its resulting shifting of the burden of proof, is applied. Sterling v. Mayflower Hotel Corp., supra; David J. Greene & Co. v. Dunhill International, Inc., 249 A.2d 427 (Del.Ch.1968); Bastian v. Bourns, Inc., 256 A.2d 680 (Del.Ch.1969) aff'd. Per Curiam (unreported) (Del.Supr.1970). The basic situation for the application of the rule is the one in which the parent has received a benefit to the exclusion and at the expense of the subsidiary.

Recently, this court dealt with the question of fairness in parent-subsidiary dealings in Getty Oil Co. v. Skelly Oil Co., supra. In that case, both parent and subsidiary were in the business of refining and marketing crude oil and crude oil products. The Oil Import Board ruled that the subsidiary, because it was controlled by the parent, was no longer entitled to a separate allocation of imported crude oil. The subsidiary then contended that it had a right to share the quota of crude oil allotted to the parent. We ruled that the business judgment standard should be applied to determine this contention. Although the subsidiary suffered a loss through the administration of the oil import quotas, the parent gained nothing. The parent's quota was derived solely from its own past use. The past use of the subsidiary did not cause an increase in the parent's quota. Nor did the parent usurp a quota of the subsidiary. Since the parent received nothing from the subsidiary to the exclusion of the minority stockholders of the subsidiary, there was no self-dealing. Therefore, the business judgment standard was properly applied.

■ A parent does indeed owe a fiduciary duty to its subsidiary when there are parent-subsidiary dealings. However, this alone will not evoke the intrinsic fairness standard. This standard will be applied only when the fiduciary duty is accompanied by self-dealing—the situation when a parent is on both sides of a transaction with its subsidiary. Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary.

We turn now to the facts. The plaintiff argues that, from 1960 through 1966, Sinclair caused Sinven to pay out such excessive dividends that the industrial development of Sinven was effectively prevented, and it became in reality a corporation in dissolution.

From 1960 through 1966, Sinven paid out $108,000,000 in dividends ($38,000,000

in excess of Sinven's earnings during the same period). The Chancellor held that Sinclair caused these dividends to be paid during a period when it had a need for large amounts of cash. Although the dividends paid exceeded earnings, the plaintiff concedes that the payments were made in compliance with 8 Del.C. § 170, authorizing payment of dividends out of surplus or net profits. However, the plaintiff attacks these dividends on the ground that they resulted from an improper motive—Sinclair's need for cash. The Chancellor, applying the intrinsic fairness standard, held that Sinclair did not sustain its burden of proving that these dividends were intrinsically fair to the minority stockholders of Sinven.

■ Since it is admitted that the dividends were paid in strict compliance with 8 Del.C. § 170, the alleged excessiveness of the payments alone would not state a cause of action. Nevertheless, compliance with the applicable statute may not, under all circumstances, justify all dividend payments. If a plaintiff can meet his burden of proving that a dividend cannot be grounded on any reasonable business objective, then the courts can and will interfere with the board's decision to pay the dividend.

Sinclair contends that it is improper to apply the intrinsic fairness standard to dividend payments even when the board which voted for the dividends is completely dominated. In support of this contention, Sinclair relies heavily on American District Telegraph Co. [ADT] v. Grinnell Corp., (N.Y.Sup.Ct.1969) aff'd. 33 A.D.2d 769, 306 N.Y.S.2d 209 (1969). Plaintiffs were minority stockholders of ADT, a subsidiary of Grinnell. The plaintiffs alleged that Grinnell, realizing that it would soon have to sell its ADT stock because of a pending anti-trust action, caused ADT to pay excessive dividends. Because the dividend payments conformed with applicable statutory law, and the plaintiffs could not prove an abuse of discretion, the court ruled that

the complaint did not state a cause of action. Other decisions seem to support Sinclair's contention. In Metropolitan Casualty Ins. Co. v. First State Bank of Temple, 54 S.W.2d 358 (Tex.Civ.App.1932), rev'd. on other grounds, 79 S.W.2d 835 (Sup.Ct. 1935), the court held that a majority of interested directors does not void a declaration of dividends because all directors, by necessity, are interested in and benefited by a dividend declaration. See, also, Schwartz v. Kahn, 183 Misc. 252, 50 N.Y.S. 2d 931 (1944); Weinberger v. Quinn, 264 A.D. 405, 35 N.Y.S.2d 567 (1942).

■ We do not accept the argument that the intrinsic fairness test can never be applied to a dividend declaration by a dominated board, although a dividend declaration by a dominated board will not inevitably demand the application of the intrinsic fairness standard. Moskowitz v. Bantrell, 41 Del.Ch. 177, 190 A.2d 749 (Del.Supr. 1963). If such a dividend is in essence self-dealing by the parent, then the intrinsic fairness standard is the proper standard. For example, suppose a parent dominates a subsidiary and its board of directors. The subsidiary has outstanding two classes of stock, X and Y. Class X is owned by the parent and Class Y is owned by minority stockholders of the subsidiary. If the subsidiary, at the direction of the parent, declares a dividend on its Class X stock only, this might well be self-dealing by the parent. It would be receiving something from the subsidiary to the exclusion of and detrimental to its minority stockholders. This self-dealing, coupled with the parent's fiduciary duty, would make intrinsic fairness the proper standard by which to evaluate the dividend payments.

■ Consequently it must be determined whether the dividend payments by Sinven were, in essence, self-dealing by Sinclair. The dividends resulted in great sums of money being transferred from Sinven to Sinclair. However, a proportionate share of this money was received by the minority shareholders of Sinven. Sinclair received nothing from Sinven to the exclusion of its

minority stockholders. As such, these dividends were not self-dealing. We hold therefore that the Chancellor erred in applying the intrinsic fairness test as to these dividend payments. The business judgment standard should have been applied.

■ We conclude that the facts demonstrate that the dividend payments complied with the business judgment standard and with 8 Del.C. § 170. The motives for causing the declaration of dividends are immaterial unless the plaintiff can show that the dividend payments resulted from improper motives and amounted to waste. The plaintiff contends only that the dividend payments drained Sinven of cash to such an extent that it was prevented from expanding.

The plaintiff proved no business opportunities which came to Sinven independently and which Sinclair either took to itself or denied to Sinven. As a matter of fact, with two minor exceptions which resulted in losses, all of Sinven's operations have been conducted in Venezuela, and Sinclair had a policy of exploiting its oil properties located in different countries by subsidiaries located in the particular countries.

From 1960 to 1966 Sinclair purchased or developed oil fields in Alaska, Canada, Paraguay, and other places around the world. The plaintiff contends that these were all opportunities which could have been taken by Sinven. The Chancellor concluded that Sinclair had not proved that its denial of expansion opportunities to Sinven was intrinsically fair. He based this conclusion on the following findings of fact. Sinclair made no real effort to expand Sinven. The excessive dividends paid by Sinven resulted in so great a cash drain as to effectively deny to Sinven any ability to expand. During this same period Sinclair actively pursued a company-wide policy of developing through its subsidiaries new sources of revenue, but Sinven was not permitted to participate and was confined in its activities to Venezuela.

■ However, the plaintiff could point to no opportunities which came to Sinven. Therefore, Sinclair usurped no business opportunity belonging to Sinven. Since Sinclair received nothing from Sinven to the exclusion of and detriment to Sinven's minority stockholders, there was no self-dealing. Therefore, business judgment is the proper standard by which to evaluate Sinclair's expansion policies.

■ Since there is no proof of self-dealing on the part of Sinclair, it follows that the expansion policy of Sinclair and the methods used to achieve the desired result must, as far as Sinclair's treatment of Sinven is concerned, be tested by the standards of the business judgment rule. Accordingly, Sinclair's decision, absent fraud or gross overreaching, to achieve expansion through the medium of its subsidiaries, other than Sinven, must be upheld.

Even if Sinclair was wrong in developing these opportunities as it did, the question arises, with which subsidiaries should these opportunities have been shared? No evidence indicates a unique need or ability of Sinven to develop these opportunities. The decision of which subsidiaries would be used to implement Sinclair's expansion policy was one of business judgment with which a court will not interfere absent a showing of gross and palpable overreaching. Meyerson v. El Paso Natural Gas Co., 246 A.2d 789 (Del.Ch.1967). No such showing has been made here.

Next, Sinclair argues that the Chancellor committed error when he held it liable to Sinven for breach of contract.

In 1961 Sinclair created Sinclair International Oil Company (hereafter International), a wholly owned subsidiary used for the purpose of coordinating all of Sinclair's foreign operations. All crude purchases by Sinclair were made thereafter through International.

On September 28, 1961, Sinclair caused Sinven to contract with International whereby Sinven agreed to sell all of its

crude oil and refined products to International at specified prices. The contract provided for minimum and maximum quantities and prices. The plaintiff contends that Sinclair caused this contract to be breached in two respects. Although the contract called for payment on receipt, International's payments lagged as much as 30 days after receipt. Also, the contract required International to purchase at least a fixed minimum amount of crude and refined products from Sinven. International did not comply with this requirement.

Clearly, Sinclair's act of contracting with its dominated subsidiary was self-dealing. Under the contract Sinclair received the products produced by Sinven, and of course the minority shareholders of Sinven were not able to share in the receipt of these products. If the contract was breached, then Sinclair received these products to the detriment of Sinven's minority shareholders. We agree with the Chancellor's finding that the contract was breached by Sinclair, both as to the time of payments and the amounts purchased.

Although a parent need not bind itself by a contract with its dominated subsidiary, Sinclair chose to operate in this manner. As Sinclair has received the benefits of this contract, so must it comply with the contractual duties.

 Under the intrinsic fairness standard, Sinclair must prove that its causing Sinven not to enforce the contract was intrinsically fair to the minority shareholders of Sinven. Sinclair has failed to meet this burden. Late payments were clearly breaches for which Sinven should have sought and received adequate damages. As to the quantities purchased, Sinclair argues that it purchased all the products produced by Sinven. This, however, does not satisfy the standard of intrinsic fairness. Sinclair has failed to prove that Sinven could not possibly have produced or someway have obtained the contract minimums. As such, Sinclair must account on this claim.

Finally, Sinclair argues that the Chancellor committed error in refusing to allow it a credit or setoff of all benefits provided by it to Sinven with respect to all the alleged damages. The Chancellor held that setoff should be allowed on specific transactions, e. g., benefits to Sinven under the contract with International, but denied an over all setoff against all damages claimed. We agree with the Chancellor, although the point may well be moot in view of our holding that Sinclair is not required to account for the alleged excessiveness of the dividend payments.

We will therefore reverse that part of the Chancellor's order that requires Sinclair to account to Sinven for damages sustained as a result of dividends paid between 1960 and 1966, and by reason of the denial to Sinven of expansion during that period. We will affirm the remaining portion of that order and remand the cause for further proceedings.