Jack ROBINSON, Plaintiff,

v.

T.I.M.E.–DC, INC., et al., Defendants.

Civ. A. No. CA–5–81–129.

United States District Court,
N.D. Texas,
Lubbock Division.

June 7, 1983.

Robert A. Finley, Kennerly, Montgomery, Howard & Finley, Knoxville, Tenn., Tom S. Milam, Crenshaw, Dupree & Milam, Lubbock, Tex., for plaintiff.

Donald E. Scott, Michael E. Baumann, Kirkland & Ellis, Washington, D.C., W. Keith McCord, McCord & Cockrill, P.C., Knoxville, Tenn., for defendants National City Lines, Inc., Contran Holding Co., Contran Corp., Harold C. Simmons, Glenn R. Simmons, Michael A. Snetzer and Hugh C. Shurtleff.

Frank G. Newman, Ronald E. Holub, Newman, Shook & Newman, Dallas, Tex., for defendant NLI Corp.

John C. Sims, Sims, Kidd, Hubbert & Wilson, Lubbock, Tex., Rudolph L. Ennis, McCampbell & Young, Knoxville, Tenn., for defendants T.I.M.E.–DC, Inc., Dale W. Barratt and F. Norman Hill.

## MEMORANDUM OPINION

WOODWARD, Chief Judge.

The above case came on for trial on March 29, 1983 with all attorneys and parties present. The case was tried before the court without a jury on March 29, 30, 31, and April 1, 1983, and after hearing and considering the pleadings, the evidence, and the briefs and arguments of the parties, the court files this memorandum opinion which shall constitute the court's findings of fact and conclusions of law.

The court has jurisdiction under 28 U.S.C. § 1331. The case was originally filed in the Eastern District of Tennessee and transferred by that Court to this Court for all proceedings.

The plaintiff, Jack Robinson, was at one time the owner of approximately 29,000 shares of preferred stock in T.I.M.E.–DC as well as some common stock in T.I.M.E.–DC T.I.M.E.–DC was at one time one of the largest trucking firms in the industry in the United States and operated on a nation-wide basis.

Plaintiff brings this suit in the form of a derivative stockholder's action and in addition to T.I.M.E.–DC, has named as defendants herein the members of the board of directors of T.I.M.E.–DC, and certain other corporations, to-wit: NLI; National City Lines; Contran Corporation; and Contran Holding Company. Mr. Harold Simmons became affiliated with T.I.M.E.–DC in November of 1980 and at about that time became chairman of its board of directors. The other individual defendants are the other members of the board of T.I.M.E.–DC.

Mr. Simmons is the trustee, for the benefit of his children, of the Simmons Trust, which owns 99% of Contran Corporation, which has now been merged with Contran Holding Company. The Simmons Trust is deemed to have control of Contran Corporation as well as National City Lines, Inc. National City Lines, Inc. owns 82% of the stock in NLI, a corporation, as well as various percentages of shares in other affiliated corporations which are not parties to this case. National City Lines, Inc. acquired control of T.I.M.E.–DC in 1980, at or about the time that Mr. Simmons became the chairman of the board of T.I.M.E.–DC.

In addition to its nation-wide trucking activities, T.I.M.E.–DC also had a retail tire outlet and engaged in the special commodities trucking activities, which involved an independent trucker hauling on behalf of T.I.M.E.–DC a full truck load of commodities that T.I.M.E. was unable to handle.

After the new board of directors was formed for T.I.M.E.–DC in late 1980, the corporation known as NLI was incorporated as a wholly owned subsidiary of T.I.M.E.–DC and T.I.M.E.–DC conveyed its real estate holdings to NLI on or about December 31, 1980.

On January 16, 1981, at a meeting of the board of directors of T.I.M.E.–DC, approval was given to the transfer of the corporate real estate holdings to NLI. On January 19th, a press release was issued by T.I.M.E.–DC informing the public of this transaction and indicating that T.I.M.E.–DC, which owned all of the stock in NLI, would "spin-off" its stock ownership in NLI to T.I.M.E.–DC's common stockholders. The plaintiff was aware of the information contained in this press release. He testified that he received a copy of it soon thereafter. (Tr. 427).

Shortly after the board meeting on January 16, 1981, the management of T.I.M.E.–DC entered into negotiations with East Texas Motor Freight (E.T.M.F.) in which the parties contemplated a merger of the two corporations. These negotiations continued until sometime in early May of 1981, when the parties were unable to reach a

final agreement and the negotiations were canceled.

On May 21, 1981, a meeting of the shareholders of T.I.M.E.–DC was held. At that time, the stockholders were made aware of the cessation of negotiations between T.I.M.E.–DC and E.T.M.F. and although there were discussions concerning the transfer of the real estate interests from T.I.M.E.–DC to NLI and the prospective spin-off, no further corporate action was taken at that time, as shown by the minutes of this meeting (Defendants' Ex. 10).

On June 15, 1981 a meeting was held with the board of directors of T.I.M.E.–DC and at that time the board ratified the conveyance of all of the real estate interests of T.I.M.E.–DC to NLI in return for the receipt by T.I.M.E.–DC of all of the common stock of NLI. The board further approved a plan to spin-off this NLI stock on a share-to-share basis to T.I.M.E.–DC's common stockholders. The meeting was continued to June 19, 1981, and on that date a press release was issued to the public setting forth these actions. (Defendants' Ex. 13). Notice was also sent to the stockholders of T.I.M.E.–DC informing these stockholders of the action of the board pertaining to the stock dividend and spin-off. (Defendants' Exs. 14 and 15).

The evidence indicates that the real estate transferred to NLI had a *book* value (cost less depreciation) of approximately $20 million dollars, but possibly an actual *market* value of approximately $40 million dollars.

The plaintiff, Mr. Robinson, had visited with one of the officers of T.I.M.E.–DC just prior to the stockholders' meeting on May 21, 1981, seeking information concerning the above proposed actions, and voiced the complaint that it was his feeling the plan was inequitable and illegal. His principal complaint was that, although he would receive the arrearage on the accrued cumulative dividends on his 29,000 shares of preferred stock in T.I.M.E.–DC, which at that time constituted 90¢ per share, he would not be allowed to convert his preferred stock to common stock in T.I.M.E.–DC and

participate in the dividend of NLI common stock unless he forfeited his right to the preferred cumulative dividend. He also made this protest at the meeting of the stockholders on May 21st, as appears in the minutes of that meeting. (Defendants' Ex. 10).

Mr. Robinson's complaint and disagreement with the plan was made known to Mr. Harold Simmons, chairman of the board of T.I.M.E.–DC, and upon his direction the plans and record dates were changed so as to permit T.I.M.E.–DC's preferred stockholders to both receive their 90¢ per share cumulative preferred dividends and, if they so desired, also convert their preferred shares into common stock of T.I.M.E.–DC and thereby receive the stock dividend of NLI common stock in the spin-off. The Certificate of Incorporation of T.I.M.E.–DC relating to the preferred stock in T.I.M.E.–DC not only provided that preferred shares would be guaranteed a 72¢ per share dividend each year before any common stock dividend could be declared, but also provided that upon the liquidation of T.I.M.E.–DC each preferred stockholder would receive $10 in cash. (Defendants' Ex. 1). Each preferred share was also redeemable by T.I.M.E.–DC at a price of $20 per share. (Defendants' Ex. 1).

Mr. Robinson elected to both take his accrued cumulative preferred dividends at a rate of 90¢ per share on his preferred stock and then convert his preferred stock to common stock in T.I.M.E.–DC, and thereby receive the common stock dividend in NLI pursuant to the spin-off arrangements.

Mr. Robinson's complaint herein is that, in spite of the amended arrangements to permit him to receive both a cash dividend on his preferred stock and a common stock dividend of NLI stock, he was, by economic necessity, required to make a choice which he did not desire to make. He apparently would have preferred to receive the cash dividend on his preferred stock, keep his preferred stock, and *also* receive the NLI common stock dividend. Unfortunately, the final spin-off plan did not permit him to do so. One of his claims in this

lawsuit is that he has been damaged by misrepresentations and omissions of material fact made to him by T.I.M.E.–DC and its officers in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5. However, Mr. Robinson has admitted in his testimony that (1) he knows of no misrepresentations that were made to him, (2) those with whom he visited were open and spoke with him with great candor, and (3) all that he knew at that time, together with all that he has learned since then, has not indicated in any way that any misrepresentations were made to him. In fact, he testified that if he were to do it all over again, knowing then what he knows now, he would do exactly what he had previously done in his transactions concerning his 29,000 shares of preferred stock. (Tr. 507). Further, he has not established in the evidence nor shown the court any omission of a material fact that would constitute a violation of 17 C.F.R. § 240.10b–5. Therefore, plaintiff's claim for damages pursuant to 17 C.F.R. § 240.10b–5 and 15 U.S.C. § 78j(b) is hereby denied.

Next plaintiff alleges that there has been a liquidation of T.I.M.E.–DC as a viable corporation. Admittedly, when T.I.M.E.–DC's real estate was transferred to NLI, a wholly-owned corporation, this may have technically reduced materially the assets of T.I.M.E.–DC by at least $20 million dollars if book value is used and perhaps by as much as $40 million dollars if actual market value is used. *Solely* the transfer to NLI of T.I.M.E.–DC's real estate did not *in fact* reduce T.I.M.E.–DC's assets, as at that point in time, all NLI stock was still held by T.I.M.E.–DC. The contract between T.I.M.E.–DC and its preferred stockholders, which consisted of the Certificate of Incorporation of T.I.M.E.–DC, Inc., expressly states and provides on page 5, in paragraph (e), as follows:

Neither the merger nor consolidation of the Corporation into or with any other corporation, nor the merger or consolidation of any other corporation into or with any other corporation into or with the Corporation, *nor a sale, transfer or lease of all or any part of the assets of the Corporation, shall be deemed to be a liquidation, dissolution, or winding up of the Corporation within the meaning of this paragraph (e).* (emphasis added).

Under Delaware law, the rights of shareholders are contract rights and to determine those rights the court must interpret the certificate of incorporation in accordance with the law of contracts. *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 937 (Del.1979); *Judah v. Delaware Trust Co.,* 378 A.2d 624, 628 (Del.1977); *Ellingwood v. Wolf's Head Oil Refining Co.,* 38 A.2d 743, 747 (Del.1944). Preferred shareholders possess only those rights which are granted to them by the provisions embodied in the certificate of incorporation. *Id.*

When viewed in the context of the specific provision of the certificate of incorporation quoted above, it is clear that neither separately nor in conjunction did the transfer of T.I.M.E.–DC's real estate to NLI and the subsequent spin-off constitute a "liquidation" of T.I.M.E.–DC which would have entitled T.I.M.E.–DC's preferred shareholders to receive their $10 per share liquidation preference.

Further, the facts establish that after the transfer and spin-off, T.I.M.E.–DC continued as an operating corporation in the trucking industry, and it had assets remaining of more than $45 million. (Defendants' Ex. 31). There is no evidence that in their completion of the spin-off T.I.M.E.–DC's board of directors intended in any way to dissolve or wind up its corporate affairs. But on the contrary, it appears that all parties intended to continue to operate it as a viable corporation. Therefore, the transactions involving the spin-off of NLI stock do not constitute a basis for affording any relief to the plaintiff on the theory that such transactions constituted a liquidation of T.I.M.E.–DC which, had such liquidation occurred, would have entitled the preferred stockholders to receive their $10 per share liquidation preference.

Later, on April 1, 1982, the Teamsters Union struck T.I.M.E.–DC and effectively shut down its nation-wide operations.

T.I.M.E.–DC did continue some of its minor operations, such as the retail tire business and the special commodities trucking operations, but otherwise it ceased doing business because of the strike. Realizing that the strike would be of a long duration, the board of directors and officers made a public decision to sell other assets of the corporation. As a matter of fact, approximately 90% of the entire rolling stock of T.I.M.E.–DC was sold. The court finds that this was a valid business transaction made within the sound judgment of the management of T.I.M.E.–DC in order to prevent the deterioration of its assets, to raise cash to provide security, and to take care of immediate corporate obligations.[1] The decision to sell this portion of the rolling stock, although it shut down the major trucking operations at the time, was caused not by the spin-off arrangement with NLI, but rather was the result of the strike, wholly divorced, separate, and apart from the spin-off. Even after these sales, there was not a liquidation or dissolution of the affairs of the corporation that would entitle recovery by plaintiff under his liquidation preference theory. Late in 1982, the strike was settled on terms acceptable to the management of T.I.M.E.–DC and beginning in the earlier part of this year, T.I.M.E.–DC again commenced trucking operations between Los Angeles and Seattle, and is gradually trying to regain its position as a major carrier in the industry. The assets of T.I.M.E.–DC were never distributed to its stockholders. Although income was practically nil, as compared to what it formerly had been, the management and board of directors of T.I.M.E.–DC took every reasonable action to preserve the assets of the corporation in order to permit it to be in a favorable position to commence operations when the strike ended, as now has occurred.

These sales of assets did not add up to a liquidation or dissolution of the corporate affairs of T.I.M.E.–DC and nothing in the provisions of the certificate of incorporation concerning preferred stock gave plaintiff the right to receive a $10 per share payment at the time of the spin-off, the sale of T.I.M.E.–DC's rolling stock, or at any other time to date.

The evidence in the case establishes that after T.I.M.E.–DC transferred and conveyed its real estate holdings to NLI, NLI sold several of these parcels, most at a profit over and above the book value as shown by the books of T.I.M.E.–DC. Other parcels of property have been conveyed by NLI to other corporations, including Keystone, which is principally owned and controlled by Mr. Simmons. Some of the property is still owned by NLI and NLI has now entered into negotiations to merge with National City Lines, another Simmons-controlled corporation. Mr. Robinson expresses a genuine concern that these valuable assets which had protected the value of his preferred stock are being dissipated and lost, and he asks that they again be placed in the possession and ownership of T.I.M.E.–DC for the benefit of its stockholders. It does appear that the real estate which formerly belonged to T.I.M.E.–DC is becoming widely scattered, principally by being fragmented in the hands of numerous corporations owned and controlled by Mr. Simmons, who also is, for all practical purposes, the principal stockholder and director of T.I.M.E.–DC. In point of fact, however, following the spin-off, plaintiff's ownership of NLI common stock gave him at least the same, and possibly a greater, ownership interest in the real estate that had formerly been owned by T.I.M.E.–DC.

■ On the other hand, the evidence establishes valid business reasons for these

---

1. The court does not have before it and hence expresses no view with regard to the question of whether the sales of T.I.M.E.–DC's rolling stock and the sales by NLI of real estate interests formerly belonging to T.I.M.E.–DC, both of which occurred following the Teamsters' strike, satisfied the requirements of § 271 of the Delaware Corporation Law. Sec. 271 requires that the majority of all outstanding stock of the corporation must vote to authorize the corporation's board to "sell, lease, or exchange all or substantially all of its property and assets" before any such action may be undertaken.

Plaintiff's complaint herein is with the transactions surrounding the spin-off.

transactions. The evidence establishes that at the time of the NLI spin-off it was advantageous to have the T.I.M.E.–DC real estate in a separate corporation rather than in a corporation which was known principally as a leader in the transportation industry. The rise in the price of the stock of NLI indicates this and in actuality the stockholders of NLI who are benefiting from this arrangement are the same as the common stockholders of T.I.M.E.–DC. There was a valid business reason for taking the steps in the spin-off arrangement.

After the spin-off there was $4.70 of common stock equity to each $1.00 of preferred stock equity in T.I.M.E.–DC. Before the spin-off, the ratio had been only $2.81 to $1.00. Dr. Dukes, the expert testifying on behalf of the defendant, indicated this increase was due to the advantages obtained through the spin-off.

Further, immediately after the spin-off, one share of NLI common stock and one share of the common stock in T.I.M.E.–DC had a combined value of approximately $4.00 to $5.00 more than one share of the preferred stock in T.I.M.E.–DC immediately before the spin-off. The stock values have fluctuated, but generally the combined value of the common stock in T.I.M.E.–DC and the common stock in NLI received by Mr. Robinson when he converted his preferred stock has always exceeded the value of what the preferred stock in T.I.M.E.–DC had been at any particular time.

While the common stockholders of T.I.M.E.–DC no longer own stock in a corporation that has ownership of the real estate in question, these common stockholders do have an ownership interest in this real estate through their ownership of the NLI stock which they received in the spin-off. The preferred shareholders of T.I.M.E.–DC who converted their shares to common shares in order to participate in the NLI stock dividend have suffered no loss, as indicated by the combined value of their common stock in NLI and common stock in T.I.M.E.–DC when compared to the value of preferred T.I.M.E.–DC stock. There has

been no showing that the real estate formerly owned by T.I.M.E.–DC has been sold by NLI for less than its market value or that there has been any mismanagement in the real estate transactions by NLI which might have caused loss to its stockholders. In fact, some of the evidence regarding the parcels sold indicates that substantial profits have been made on the sales.

As a matter of fact, Mr. Robinson made a free choice of the course he wished to follow between those which were offered to him by the management of T.I.M.E.–DC. He may not have liked the choices afforded him, but the spin-off plan, as actually implemented, afforded him every right to which he was entitled under the corporate charter of T.I.M.E.–DC, as a preferred stockholder. No fraud or bad faith on the part of T.I.M.E.–DC or its officers has been proved or established, and the evidence indicates that Mr. Robinson's stock has increased in value over the value that it would have had had there been no spin-off arrangement. In fact, if the court were to grant the rescission of the spin-off and transfer of T.I.M.E.–DC's real estate assets to NLI, as requested by plaintiff, the evidence appears to indicate that such an action would leave plaintiff in a less advantageous economic position than the one in which he currently finds himself.

Next, plaintiff claims that he was "forced out of economic necessity" to convert his preferred T.I.M.E.–DC stock to T.I.M.E.–DC common stock. His argument is that the removal of T.I.M.E.–DC's real estate assets from that corporation, through the NLI spin-off, left T.I.M.E.–DC's equity situation in such a condition that the liquidation preference rights of T.I.M.E.–DC's preferred shareholders were damaged thereby. There is simply no evidence to support such a contention. On the contrary, the unequivocal evidence is that at all times before and after the spin-off there was sufficient preferred equity in T.I.M.E.–DC so as to have paid the full $10 per share liquidation preference on all outstanding

shares of T.I.M.E.–DC preferred stock.[2] (*See, e.g.,* Defendants' Ex. 31).

■ Finally, plaintiff claims that defendants breached their fiduciary duties to the preferred shareholders of T.I.M.E.–DC because they failed to structure the NLI spin-off in such a way as permit T.I.M.E.–DC's preferred shareholders to keep their liquidation preference and redemption rights in T.I.M.E.–DC and still participate fully in the NLI stock dividend. The board of directors of T.I.M.E.–DC owed a fiduciary duty not only to the preferred shareholders, but also to T.I.M.E.–DC's common shareholders and ultimately to the corporation itself as well. These duties can sometimes conflict, and balancing them is a difficult task. As a result, the courts will ordinarily refuse to disturb the decisions of a board of directors, which enjoy a presumption of sound business judgment, if they can be attributed to any rational business purpose. *Sinclair Oil Corporation v. Levien,* 280 A.2d 717, 720 (Del.1971). The mere fact that plaintiff might have received a greater financial benefit from a different structuring of the spin-off transactions does not justify voiding the transactions, in the absence of some showing of otherwise wrongful conduct by defendants. *Abelow v. Symonds,* 184 A.2d 173, 176 (Del.Ch.1962).

The evidence in the case shows that (1) defendants relied upon the advice of counsel in structuring the NLI spin-off, (2) counsel advised defendants that his interpretation of the certificate of incorporation was such that he believed preferred shareholders could not receive any dividends in excess of their accrued cumulative annual 72¢ per share dividends, (3) plaintiff complained about the initial structuring of the spin-off (Tr. 457–62), and (4) in response thereto, defendants rescheduled the record dates for conversion to enable T.I.M.E.–DC's preferred shareholders to both receive their accrued preferred dividends and still participate in the NLI stock dividend (Tr. 101–02).

In such circumstances, the court finds that plaintiff has not established by a preponderance of the evidence that defendants breached their fiduciary duty to him, as a preferred shareholder, because of the manner in which the NLI spin-off was structured.

■ In his post-trial briefs plaintiff alleges that because National City Lines, Inc. owned a majority of the stock in T.I.M.E.–DC at the time of the spin-off, that transaction must be examined under the standard of intrinsic fairness, as set forth in *Sinclair Oil Corp. v. Levien,* 280 A.2d 717 (Del.1971). This allegation cannot withstand close scrutiny. *Sinclair Oil Corp. v. Levien* involved a direct transaction between a parent and subsidiary corporation. The *Levien* court made it clear that the intrinsic fairness test applies principally in those situations "in which the parent has received a benefit to the exclusion and at the expense of the subsidiary." 280 A.2d at 720. There is nothing in the record of this case to indicate that National City Lines, Inc. received a benefit from the spin-off to the exclusion or detriment of T.I.M.E.–DC, as a corporation.[3] On the contrary, the evidence is overwhelming that the shareholders of T.I.M.E.–DC who participated in the spin-off and received shares of NLI stock are in a better economic position today than they would have been had there been no spin-off.

Plaintiff apparently relies on a hypothetical example of self dealing set forth by the *Levien* court as a grounds for his recovery herein. In *Levien,* the Delaware Supreme Court set out a hypothetical situation in which a parent company owned one class of

---

**2.** *Compare Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 n. 12 (Del.1979), wherein plaintiffs, who challenged a spin-off, acknowledged that, for balance sheet purposes, preferred equity was unchanged by the spin-off.

**3.** In *Levien,* the plaintiff argued (1) that the parent company forced its subsidiary to pay out excessive dividends, thereby depriving the subsidiary of an opportunity for industrial development, and (2) that the parent prevented the subsidiary from enforcing its valid contract rights against a second subsidiary, to the detriment of the former.

stock in a subsidiary (Class X), while a second class of stock in the subsidiary (Class Y), was owned by minority shareholders of the subsidiary. In such a situation, the Delaware court hypothesized, if the subsidiary, at the direction of the parent, were to declare a dividend on its Class X stock only, "this might well be self dealing by the parent." *Id.* at 721. Unfortunately for plaintiff herein, the NLI spin-off does not meet the factual requirements of this hypothetical situation. It is undisputed that *both* preferred and common shareholders in T.I.M.E.–DC received dividends in the spin-off arrangement. T.I.M.E.–DC's preferred shareholders received both their accrued cumulative preferred dividends and the opportunity to convert and participate in the NLI stock dividend. In such an instance, the court does not believe National City Lines, Inc. can be judged guilty of self dealing in such a way as to act to the detriment of T.I.M.E.–DC's preferred shareholders. Accordingly, the intrinsic fairness test and its attendant shift in the burden of proof is not appropriate in this case.

Therefore, all relief prayed for by plaintiff is hereby denied. A judgment will be entered accordingly.