# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE GLOBAL DISCOVERY     )
BIOSCIENCES CORPORATION,   )  C.A. No. 2021-0196-SG
a Delaware Corporation.        )

## MEMORANDUM OPINION

Date Submitted: May 25, 2022
Date Decided: May 31, 2022

Stephen C. Norman and David A. Seal, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Eric Landau and Travis Biffar, of ELLENOFF GROSSMAN & SCHOLE LLP, Irvine, California, *Attorneys for Petitioners Dr. Khalid bin Jabor Al-Thani and Trivalley Trading & Contracting, WLL.*

Corinne E. Amato, Mary S. Thomas, John G. Day, and Christine N. Lafferty, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Marc P. Miles and Kristy A. Schlesinger, of SHOOK, HARDY & BACON L.L.P., Irvine, California, *Attorneys for Respondent Douglas S. Harrington, M.D.*

**GLASSCOCK, Vice Chancellor**

This matter is before me to confirm the validity of a consent by the stockholders of Global Discovery Biosciences Corporation ("GDBC" or the "Company") executed on January 31, 2021 and delivered on February 12, 2021 (the "Consent"), purporting to replace the GDBC board of directors (the "Board") with four designees (such designees together, the "Petitioners' Board").[1] Respondent Harrington, the founder and a former director of GDBC,[2] opposes on the ground that the stockholders who voted for the Consent, at the time of the Consent, did not control a majority of the stock in GDBC; instead, the Respondent avers that he himself was the controller of the Company.[3] The matter is summary in nature, pursuant to Delaware General Corporation Law Section 225.[4]

At the hearing on a written record, held on May 3, 2022,[5] counsel for the Respondent opened his argument by asserting that "[t]his case is one of equity."[6] Just so. For the following reasons, I find that application of equity to the facts submitted, and in light of a California decision which is, in part, *res judicata* of the

---

[1] Where the facts are drawn from exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and with page numbers derived from the stamp on each JX page ("JX __, at ___"). JX 70, at 2, 3.

[2] *See* JX 5 (written consent by sole incorporator electing Harrington as the sole director); JX 134 (noting the resignation of Dr. Harrington as a director and officer as of March 10, 2021).

[3] *See, e.g.*, Douglas S. Harrington, M.D.'s Answering Pre-Trial Br. 2, Dkt. No. 101 [hereinafter "Resp. PTB"].

[4] 8 *Del. C.* § 225.

[5] Tr. of 5.3.22 Trial – Held Via Zoom, Dkt. No. 118 [hereinafter "Trial Tr."].

[6] *Id.* at 26:19.

issues here,[7] the Consent was valid, and since its execution the directors of GDBC have been the Petitioners' Board.

## I. BACKGROUND

This case has a complicated procedural background. To simplify for the reader, the Company, the Respondent, and the Petitioners (defined below) are in the midst of at least three litigations: one in California (the "California Case"), a bankruptcy for GDBC (the "Bankruptcy Proceeding"), and the instant action.[8]

In the instant action, Petitioners Khalid and his company Trivalley Trading & Contracting WLL (the "Petitioners") seek a determination that the Petitioners' Board established by the Consent is the current and valid Board of GDBC.

Prior to the Consent, the Board of GDBC was composed of three directors: Respondent Harrington, Mrs. Estrella Harrington (the Respondent's wife), and Ms. Munira Al-Delemi.[9]

The California Case as originally filed was initiated by GDBC against the Petitioners, bringing claims for fraud, breach of oral contract, injunctive relief,

---

[7] *See* JX 67 [hereinafter "SOD"].

[8] *See, e.g.*, JX 39 (original California complaint); JX 72 (claims register from Central District of California bankruptcy action).

[9] *See* JX 13. Al-Delemi has not been involved in the instant action whatsoever. Note that there is some confusion over the resignation of various Board members, including both of the Harringtons, and the potential appointment of at least one officer to the Board predating the Consent. *See* Trial Tr. 84:13–85:5. This change in Board composition, if it validly occurred, occurred around the time of initiation of the Bankruptcy Proceeding. *See* JX 134. The exact composition of the Board removed by the Consent is not essential to my findings here.

intentional interference with prospective economic advantage, and cancellation of a stock certificate.[10] The Petitioners and another GDBC stockholder, Khoury, have since filed multiple cross-complaints.[11] To pare down the issues in the California Case, the parties submitted a singular issue for determination by a judicial referee:[12] "Whether KHALID and/or TRIVALLEY has a valid ownership interest in shares of GDBC stock, and if so, how many shares and what percentage of the shares, including, without limitation, any shares purportedly assigned to said parties by KHOURY."[13]

The Honorable Judith Ryan (Ret.) was the judicial referee.[14] After a ten-day live witness trial,[15] and after multiple rounds of objections and amendments,[16] Judge Ryan submitted a Second Amended Statement of Decision (the "SOD") on November 18, 2019, which found as follows:

> The undersigned Finds and Determines that Defendants KHALID and/or TRIVALLEY has a forty percent (40%) ownership interest in shares of GDBC stock . . .

---

[10] JX 39.

[11] *See, e.g.,* JX 43, 44, 63.

[12] *See* Douglas Harrington, M.D.'s Mot. to Stay the Action, at Ex. 6, Dkt. No. 24 [hereinafter "Order of Reference"].

[13] *Id.* at 5. Khoury had previously received a 15% interest in the Company from the Respondent due to his work connecting the Company with potential investors. *See* JX 67, at 37, 42 (explaining this reasoning and ultimately finding that the 15% interest received was not contingent).

[14] Order of Reference 5.

[15] *See* Pet'rs' Opening Pretrial Br. 8, Dkt. No. 90.

[16] SOD 2–3.

> The undersigned Finds and Determines that NAJIB KHOURY had a fifteen percent (15%) ownership interest in GDBC pursuant to the transfer of the 15% interest in GDBC from Dr. Harrington to NAJIB KHOURY.
>
> The undersigned Finds and Determines that Defendants KHALID and/or TRIVALLEY have a further fifteen percent (15%) ownership interest in the GDBC [sic] pursuant to the assignment of the 15% interest of Najib Khoury assigned to said parties by NAJIB KHOURY.
>
> The undersigned Finds and Determines that Defendants KHALID and/or TRIVALLEY has a total 55% percent (55%) ownership interest in GDBC based upon the 40% interest as set forth . . . above, and the 15% interest as set forth . . . above. Defendants KHALID and/or TRIVALLEY are entitled to a total fifty-five percent (55%) ownership interest in the total number of shares of GDBC that may otherwise be determined in the further proceedings in this matter.[17]

Notably, the SOD did not make findings as to (1) the exact number of shares of GDBC held by any of the parties to the California Case; or (2) dilution, if any, that had occurred in the intervening years between the Petitioners' receipt of the 40% and 15% interests and the date of issuance of the SOD.[18]

The SOD predated the Consent by a little over a year: the SOD was released on November 18, 2019, and the Consent was delivered on February 12, 2021.[19] This action was filed on March 8, 2021, seeking a declaratory judgment under Section

---

[17] *Id.* at 51.

[18] *See generally* SOD. The SOD, necessarily, also did not (because it could not) consider any dilution that has occurred post-dating the decision.

[19] *See supra* notes 1 and 17 and accompanying text.

225 declaring that the prior Board of GDBC (the "Prior Board") had been replaced with Petitioners' Board.[20] A "Suggestion of Bankruptcy" was filed on this docket on March 15, 2021, informing the Court[21] that GDBC[22] had commenced the Bankruptcy Proceeding as of March 11, 2021,[23] (that is, three days post-complaint), and that this action was therefore stayed pursuant to the automatic stay triggered under 11 U.S.C. Section 362.[24]

The court in the Bankruptcy Proceeding granted limited relief from the stay, allowing this action to move forward, on July 20, 2021.[25] The Respondent then moved for a stay, originally on the basis that the SOD—and its determination that the Petitioners controlled the majority of shares in GDBC—was the result of a "special reference" under California law, which would have been nonbinding in nature.[26] This motion was contested; prior to its resolution, a ruling was issued in the California Case, finding that the SOD was the result of a binding general reference under California civil procedure rules and that the SOD "must stand as the decision of the court."[27]

---

[20] *See* Verified Compl. Pursuant to 8 *Del. C.* § 225, Filed on Behalf of the Pls. ¶¶ 14–18.
[21] This case was before Vice Chancellor Slights III at that time and has since been reassigned to me.
[22] The notice is unclear as to which parties or non-parties caused GDBC to enter into bankruptcy.
[23] Suggestion of Bankruptcy of Global Discovery Biosciences Corporation, Dkt. No. 7.
[24] 11 U.S.C. § 362.
[25] *See, e.g.*, Letter to the Honorable Joseph R. Slights III from Stephen C. Norman on Behalf of Pls. Regarding the Schedule, at Ex. A, Dkt. No. 8.
[26] Douglas Harrington, M.D.'s Mot. to Stay the Action 9, Dkt. No. 23.
[27] JX 88, at 4–6.

The Respondent then shifted positions in supporting his motion to stay. Harrington's overall argument in favor of finding the Consent invalid is predicated upon the SOD's decision *not* to address dilution.[28] He posits that dilution occurred, which was not taken into account in the SOD, such that the Consent was not executed by a majority of the stockholders of GDBC.[29] Further, he argued at this time that the California Case would necessarily address the issue of dilution, and therefore this action ought to be stayed given the risk of inconsistent rulings.[30]

I requested supplemental briefing as to whether the question of dilution would be addressed necessarily in the resolution of the California Case.[31] Upon review of the briefing, I gave a bench ruling on February 10 (the "Bench Ruling"), denying the motion to stay.[32] Upon request, the parties provided further supplemental briefing as to whether this action should proceed as a summary matter or in the ordinary course.[33] At a teleconference following the parties' submissions (the "March

---

[28] *See generally* Resp't Douglas S. Harrington, M.D.'s Suppl. Br. Further Supp. His Mot. to Stay, Dkt. No. 70.

[29] *Id.*; *see also* Tr. of 2.1.22 Oral Arg. on Resp't Douglas S. Harrington's Mot. to Stay 9:14–10:15, Dkt. No. 75 [hereinafter "MTS Arg."].

[30] MTS Arg. 10:16–12:10.

[31] MTS Arg. 37:2–38:7.

[32] Tr. of 2-10-2022 Telephonic Rulings of the Ct. on Resp't's Mot. to Stay, Dkt. No. 78 [hereinafter "Bench Ruling"].

[33] Resp't Douglas S. Harrington, M.D.'s Second Further Submission Supp. Mot. to Stay, Dkt. 79; Pet'rs' Suppl. Reply Br. on Utility of a Summ. Proceeding, Dkt. No 80.

Teleconference"), I determined that the matter should be treated as a summary proceeding,[34] and the case then went forward to a paper trial.

The reader may pause here to wonder at the impetus for both the Delaware action's initiation and the Respondent's opposition. GDBC is, as I have stated, in bankruptcy (moreover, it is presently in Chapter 7 liquidation as compared to the original Chapter 11 reorganization).[35] At trial, counsel for the Respondent indicated Harrington's belief that the Company has no value or negative value.[36] Counsel for the Petitioners had previously indicated their belief that the Company may have recoverable value, including a potential litigation asset for improper removal of assets from the Company just prior to the Bankruptcy Proceeding.[37] If the Petitioners can establish that the Petitioners' Board was the true Board of GDBC at the time the bankruptcy was authorized, they intend to argue to the Bankruptcy Court that the placement of the Company into bankruptcy was unauthorized, and seek relief allowing them to pursue claims to recover assets of the estate behalf of GDBC.[38] Thus, this action is not the paradigm of a Section 225 summary proceeding. Nonetheless, I have endeavored to issue this Memorandum Opinion on an expedited schedule.

---

[34] *See* Tr. of 3-8-2022 Telephonic Status Conference, Dkt. No. 85 [hereinafter "March Tr."].
[35] *See* JX 86, at 24:13–14.
[36] Trial Tr. 79:8–12.
[37] *Cf., e.g.*, MTS Arg. 26:13–28:2.
[38] *See* Trial Tr. 83:11–86:10; *cf.* 66:7–12 (Respondent's counsel summarizing the Petitioners' theory of value).

At the March Teleconference, the parties and I discussed the pertinent timeframe for assessing dilution,[39] but I did not make any express rulings at that time as to the applicable period. My understanding following the March Teleconference, however, was that, given the Bench Ruling's emphasis on the SOD's use of the then *present tense* to describe the Petitioners' interests in GDBC,[40] the pertinent timeframe would run from the issuance of the SOD until the Bankruptcy Proceeding was initiated. In calendar dates, that timeframe would be November 18, 2019 until March 11, 2021.

The Respondent's primary argument at trial was that Harrington received equity in the Company in two ways that diluted the Petitioners: (1) receipt of equity in exchange for cash infusions into the Company from June 2015 through June 2019 (the "Equity Issuances"); and (2) receipt of equity in lieu of cash consideration under a consulting agreement (the "Consulting Agreement") between himself and the Company from February 2016 until March 10, 2021 (the "Equity Consideration").[41]

I note that path (1) is entirely outside of the calendar dates identified immediately above, and that path (2) is also partially temporally beyond the identified calendar dates. Despite this, because I find that Harrington cannot

---

[39] *See* March Tr. at 6:17–10:10.
[40] Bench Ruling, at 7:19–8:2. The SOD, unfortunately, did not tie its findings to a particular point in time. *See generally* SOD.
[41] Resp. PTB 25.

9

demonstrate dilution in any event, I need not determine if the SOD limits the inquiry to post-November 18, 2019.  I consider below *all* of Harrington's arguments that GDBC issued equity to him, beyond the 40% interest found by the California judicial referee.[42]

## II. ANALYSIS

In support of the Equity Issuances, the Respondent testified in his deposition that he and his wife, who constituted a majority of the GDBC Board at the pertinent time (the "Old Board"),[43] "discussed it and agreed that the money that [Harrington] put in would be converted to equity."[44]  All parties are agreed that corporate formalities, such as giving notice of a Board meeting, taking meeting minutes, or issuing share certificates, were not followed: per Harrington, "we felt [it] was sufficient at the time" to authorize the Equity Issuances verbally.[45]  The third

---

[42] *See, e.g.*, SOD 15 ("Plaintiff [Harrington] and Defendants [the Petitioners] were each to be 40 percent shareholders in the newly formed GDBC.").  I also deny, again, Harrington's request for leave to assert a Section 205 counterclaim.  *See* Douglas S. Harrington, M.D.'s Post-Trial Br. 9 n.2, Dkt. No. 120.  Harrington moved to amend his answer on April 14, 2022, with trial scheduled for May 3, 2022.  Douglas S. Harrington, M.D.'s Mot. for Leave to Amend His Answer to Verified Compl., Dkt. No. 89.  I denied this motion by telephone conference on April 26, 2022, stating that amendment would "result in prejudice to the Petitioners here."  *See* Tr. of 4-26-22 Telephonic Status Conference 6:15–7:2, Dkt. No. 111.  Upon consideration of the full record, which is now before me, my prior finding—that amendment would prejudice the Petitioners—remains true.

[43] The Old Board consisted of Harrington, his wife, and an equity holder in GDBC, Al-Delemi.  I use the term Old Board to differentiate from the Prior Board, which purported to put GDBC into bankruptcy—as I have noted above, the record is unclear as to the makeup of the Prior Board. *See* Trial Tr. 84:7–85:7 (indicating the lack of clarity as to the Board that placed GDBC into the Bankruptcy Proceeding).

[44] JX 99, at 19:1–7.

[45] *Id.* at 20:14–16.

10

director, Al-Delemi, was excluded from these "Board" discussions.[46] The Equity Issuances in question were not continuous, but Harrington testified that "each time a transaction occurred," he and Mrs. Harrington would go through the same discussion process in lieu of a formal meeting.[47]

The Equity Consideration, per the Respondent, stemmed from the Consulting Agreement submitted as joint exhibit 34.[48] The Consulting Agreement stipulates that Harrington was to receive "a salary at the annualized rate of $300,000 per year" in exchange for his service as Chief Executive Officer ("CEO") of the Company.[49] The Consulting Agreement does not provide for that $300,000 consideration to be received as equity.[50]

Nonetheless, the Respondent again testified at his deposition to this matter, stating that he and his wife discussed the Consulting Agreement and "said it was appropriate" to convert the salary into equity grants, but came to this conclusion without documentation, and without consideration by the full Old Board.[51] Again,

---

[46] Harrington testified at his deposition that he could not recall whether Al-Delemi participated in any of the Board conversations described above. *Id.* at 43:7–22. But his declaration clearly states that only he and Mrs. Harrington approved each. *See* JX 92.

[47] JX 99, at 20:2–22:19.

[48] JX 34.

[49] *Id.* at §§ 2, 3.

[50] *See id.*

[51] JX 99, at 40:8–13.

Al-Delemi was apparently excluded from any alleged discussions.[52] Per the Respondent, at the end of every year, he and his wife met and approved the conversion of the deferred income under the Consulting Agreement into equity, by oral agreement.[53] As with the Equity Issuances, corporate formalities were not followed, the Old Board did not participate in full, and no documents reflect the purported agreements.[54]

Respondent Harrington has filed a sworn declaration in support of his testimony about both the Equity Issuances and the Equity Consideration.[55]

In a Section 225 action, a petitioner bears the burden of demonstrating that it is entitled to relief.[56] The Petitioners have made a *prima facie* showing for relief by way of the Consent, bolstered by the finding of the California court that the Petitioners hold a majority of GDBC stock.[57] The burden accordingly has shifted

---

[52] Harrington stated that he did not recall any discussions with Al-Delemi about converting the salary under the Consulting Agreement into equity, but he also testified that he never spoke to her about the Consulting Agreement. *See id.* at 43:10–22; 35:9–21.

[53] *Id.* at 41:7–43:13.

[54] *See id.*

[55] *See* JX 92.

[56] *See In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008) (stating that the standard is preponderance of the evidence) (citing *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 276 (Del. Ch. 2003); and then citing *Interim Health Care v. Fournier*, 1994 WL 89007, at *5 (Del. Ch. Feb. 28, 1994)); *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 453 (Del. Ch. 2012) (citations omitted); *Boris v. Schaheen*, 2013 WL 6331287, at *12 (Del. Ch. Dec. 2, 2013) (citing *Hockessin*, 59 A.3d at 453). *But see Oberly v. Kirby*, 592 A.2d 445, 457 (Del. 1991) ("Before a court declares invalid a corporate election that was held thirty-seven years ago and thereby upsets long-settled expectations and reliance upon assumed events, it is entitled to demand clear and convincing evidence that the election was, in fact, invalid.").

[57] *See, e.g.*, *Zhou v. Deng*, 2022 WL 1024809, at *4 (Del. Ch. Apr. 6, 2022).

to the Respondent to challenge the validity of the Consent.[58] The exact threshold the Respondent must clear to successfully rebut the Petitioners' showing is uncertain under our caselaw; at least one Supreme Court case states that the burden is "clear and convincing evidence,"[59] but even if the burden were a preponderance of the evidence, I would reach the same result here.

As I have suggested above, my view as to the appropriate timeframe for dilution to have occurred is, due to *res judicata* in the California Case, the period of time following the issuance of the SOD until the initiation of the Bankruptcy Proceeding. But even if the pertinent period were from inception of the Company until present-day, the Respondent has brought no evidence other than his own (necessarily self-interested) testimony and declaration to prove his ownership of GDBC stock via the Equity Issuances and the Equity Consideration.

In support of the Equity Issuances, the Respondent's counsel put forward at trial certain brokerage statements showing withdrawals from the Respondent's personal funds,[60] but the mere fact of a withdrawal is insufficient to show that the money in question was ultimately invested in the Company. Even if proof of the Company's receipt of funds had been shown, the brokerage statements do not

---

[58] *See, e.g., id.* at *3.
[59] *Oberly*, 592 A.2d at 457.
[60] *See, e.g.,* JX 23, JX 24, JX 25, JX 26, JX 27, JX 29, JX 30 (a partial listing of the brokerage statements submitted as joint exhibits).

support a finding regarding *who* invested in the Company—whether the Respondent invested personally, as argued,[61] or whether the Respondent invested via his personal entity, as had been previous practice,[62] or otherwise. Beyond this, and important to my decision here, even if I find that Harrington personally invested his own funds, there is no proof (beyond, again, the Harringtons' self-serving testimony) that these payments were in the form of an equity investment rather than as a loan. In short, the brokerage statements prove a withdrawal of funds from the Harringtons' personal accounts; they do not prove more.

With respect to the Equity Consideration, at trial no evidence was shown beyond the existence of the Consulting Agreement. I have already noted above that the agreement does not itself support the idea that Harrington was entitled to be paid in equity for services as a CEO. The only evidence before me purportedly proving the entitlement to stock in GDBC by way of the Equity Consideration is Harrington's deposition testimony and declaration.

In addition, no corporate formalities support the finding that the Respondent either made equity purchases from 2015 until 2019 or that the Respondent and the Company had agreed to pay out consideration due under the Consulting Agreement

---

[61] Trial Tr. 49:2–19 (noting that the brokerage statements reflect withdrawals from Harrington's "personal account, not Ark [Partner]'s").

[62] *Id.* at 13:18–19 ("Monies advanced by Harrington throughout the years were in the form of an Ark Partner loan.").

in the form of equity. Harrington asserts that he and his wife, without the action of the full Old Board, agreed that he would receive equity in some amount to be determined. Not so much as a GDBC IOU exists. I do not find Harrington's assertion credible; more importantly, even if true, this assertion is insufficient to bind GDBC to a retroactive issuance of equity. I find that the Respondent has failed to demonstrate that he purchased or received equity in the Company so as to cause dilution pertinent to the question of the Consent's validity.[63]

Respondent's counsel urged at trial that, if the lack of corporate formalities was acceptable with respect to equity issuances to the Petitioners and to Khoury (as the SOD found by implication), the same treatment should be applied equally to the Respondent, as befitting equity.[64] That is, the Petitioners and Khoury were able to receive and transfer stock in the Company with deficient GDBC corporate formalities. Thus, per the Respondent, fairness dictates that Harrington should also be able to receive stock in the Company, overlooking deficient corporate formalities.

---

[63] Because of the lack of affirmative evidence in support of the Respondent's case, I need not reach the question of whether the Ark Partner investments in the Company were in the form of loans or equity investments. (I note that nothing in this Memorandum Opinion should be read as preclusive of the Harringtons' rights, via Ark Partner or otherwise, as a creditor of GDBC as relates to the Bankruptcy Proceeding.) For present purposes, I also do not need to rely upon Exhibit 141, the subject of an eleventh-hour motion in limine, accordingly moot. Ms. Harrington's declaration was the subject of a motion by the Petitioners to exclude; I need not decide this, because this declaration, if considered together with the other evidence, is insufficient to a showing of dilution.

[64] *See* Trial Tr. 41:12–44:3.

While this argument might have instinctive appeal, it founders when confronted with Harrington's status as a director of GDBC. Because Harrington was a director of the Company, any equity transaction between himself and the Company was necessarily self-dealing in nature.[65] This rationale might be somewhat less compelling if the sole stockholders in the Company were Harrington and his wife—the belief the Respondent purportedly acted under[66]—but the Petitioners, Khoury, and Al-Delemi were each stockholders in the Company, to whom the Respondent, as a director, owed fiduciary duties. I need not reach, and it would be inappropriate in the context of a Section 225 action *to* reach,[67] the question of whether the Equity Issuances or the Equity Consideration—supposing they were actually attempted—could have led to liability for failure of entire fairness or otherwise. It is enough to say that the Respondent's status as a fiduciary differs from that of an ordinary stockholder. The latter obtained equity without corporate formality, due to shortcomings on the part of *Harrington* and the Old Board. Harrington himself, in equity, is as a *self-dealing fiduciary* not entitled to benefit from the same shortcomings *for which he himself is responsible*. Therefore, what a great Sussex

---

[65] *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del. 1995) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)) ("Traditionally, the term 'self-dealing' describes the 'situation when a [corporate fiduciary] is on both sides of a transaction . . . .'").

[66] JX 99, at 22:1–5 ("We were—felt that we were the only owners at the time [of the Equity Issuances]. That's what we believed. And we didn't think [issuing stock certificates in exchange for the cash infusions] was necessary. So the answer is no, we did not. We did not issue share certificates.").

[67] *Zhou*, 2022 WL 1024809, at *3–4.

County trial judge[68] aptly referred to as the "goose-gander" rule is strikingly inapplicable here.

Because the Respondent has failed to show convincing proof of his equity ownership in the Company beyond that established by the SOD, there is no reason on the record before me to disturb Judge Ryan's finding. That finding concluded that Petitioner Khalid (and/or Trivalley) *has* a 55% ownership interest in the Company, as of November 18, 2019. I have not found credible any evidence that would alter the ownership percentage, either prior to or after that date.

## III. CONCLUSION

Because the Petitioners had a 55% ownership interest in GDBC at the time of the Consent's execution, I find that the Consent was valid under Delaware law, and thus that the Petitioners' Board replaced the Prior Board as of that time. I need not address the number of shares outstanding, and make no further findings as to the present ownership of the Company among the various stockholders, and no further findings as to dilution, in accordance with our Supreme Court's instruction in *Genger v. TR Investors, LLC*.[69]

---

[68] The Honorable T. Henley Graves.

[69] 26 A.3d 180, 199–200 (Del. 2011) (quoting *Agranoff v. Miller*, 1999 WL 219650, at *18 (Del. Ch. Apr. 12, 1999), *aff'd as modified*, 737 A.2d 530 (Del. 1999)) ("A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer . . . . The *in rem* character of a Section 225 action 'imposes important limits on the scope of [a] court's remedial powers even as to claims bearing on whether a person lawfully holds corporate office.'").

The parties should submit a form of order.