IVANHOE PARTNERS, a Texas general partnership and Ivanhoe Acquisition Corporation, a Delaware corporation, Plaintiffs,

v.

NEWMONT MINING CORPORATION, a Delaware corporation, Randolph I.J. Agnew, Joseph P. Flannery, Edward P. Fontaine, Thomas B. Holmes, Richard B. Leather, William B. Moses, Jr., Gordon R. Parker, Robin A. Plumbridge, William I.M. Turner, Jr., Consolidated Gold Fields PLC, a United Kingdom corporation, Gold Fields American Corporation, a Delaware corporation, and the Special Purpose, Inc., a Delaware corporation, Defendants.

The First Boston Corporation, New York Stock Exchange, Inc., and National Securities Clearing Corporation, Intervenors.

In re NEWMONT MINING CORP. SHAREHOLDERS LITIGATION.

Civ. A. Nos. 9281, 9221.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 1, 1987.
Decided: Oct. 15, 1987.

Houston, Tex., for plaintiffs Ivanhoe Partners and Ivanhoe Acquisition Corp.

Joseph A. Rosenthal of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Goodkind, Weschler, Labaton & Rudoff, New York City, Robert A. Skirnick, (argued), and John Halebian, of Wolf Popper Ross Wolf & Jones, New York City, Roger Kirby, of Kaufman Malchman Kaufmann & Kirby, New York City, David J. Bershad, of Milberg Weiss Bershad Specthrie & Lerach, New York City, for class plaintiffs in Consol. Civ. A. No. 9221.

Michael D. Goldman, Charles S. Crompton, Jr., Donald J. Wolfe, Jr., and Richard L. Horwitz, of Potter Anderson & Corroon, Wilmington, Bernard W. Nussbaum, Theodore N. Mirvis (argued), and Paul K. Rowe, of Wachtell, Lipton, Rosen & Katz, New York City, Richard Hollwell, of White & Case, New York City, for defendants Newmont Mining Corp., Gordon R. Parker, Edward P. Fontaine, and Richard B. Leather.

John Hall, of Debevoise & Plimpton, New York City, for defendants Independent Directors of Newmont Mining Corp.

A. Gilchrist Sparks, III, Lawrence A. Hamermesh, and Kenneth Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, Lewis A. Kaplan (argued), Moses Silverman, Colleen McMahon, Abby Jennis, Clyde Allison, and Mary Crawley, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Consol. Gold Fields PLC, Gold Fields American Corp., and the Special Purpose, Inc.

Rodman Ward, Jr. and Edward P. Welch, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Ann Crawford, of Skadden, Arps, Slate, Meagher & Flom, New York City, for intervenor, The First Boston Corp.

Donald Elihu Evans, of Bryde, Ament & Evans, and Milbank, Tweed, Hadley & McCloy, New York City, for intervenors, The New York Stock Exchange and The Nat. Securities Clearing Corp.

Charles F. Richards, Jr., (argued), Samuel A. Nolen, William J. Wade, C. Stephen Bigler, Gregory P. Williams, Thomas A. Beck, and Anne F. Bugg, of Richards, Layton & Finger, Wilmington, Baker & Botts,

## OPINION

JACOBS, Vice Chancellor.

The pending motion for a preliminary injunction involves a challenge under Dela-

ware law to an antitakeover defense some times picturesquely described as a "street sweep." That sobriquet is used by *cognoscienti* in the esoteric field of corporate takeovers to refer to a rapid accumulation of a large block of target corporation's stock, through open market or privately negotiated purchases or a combination of both. Until now the validity of "street sweeps" which facilitate or impede a hostile takeover has been decided under federal law. Recent federal court challenges of street sweeps have met with little success.[1] Insofar as this Court is aware, no street sweep has previously been challenged under Delaware corporate fiduciary principles.

The present challenge arises in the following circumstances: a hostile tender offeror (here, Ivanhoe Partners and Ivanhoe Acquisition Corporation, referred to collectively as "Ivanhoe"), owns approximately 10% of the stock of the target corporation (here Newmont Mining Corporation, referred to as "Newmont"). Both Ivanhoe and a class of Newmont shareholders seek injunctive relief against a street sweep conducted by the target corporation's largest (26.2%) stockholder (here Consolidated Gold Fields PLC and its subsidiaries, Gold Fields American Corporation and The Special Purpose, Inc., referred to collectively as "Gold Fields"). The street sweep, if allowed, would make Gold Fields the 49.9% owner of Newmont's shares which, when combined with the stock owned by Newmont's directors, represents a majority of Newmont's outstanding shares. The street sweep would also assure the defeat of Ivanhoe's tender offer, which is conditioned upon Ivanhoe owning 51% of Newmont's stock. The street sweep was conducted with the knowledge and nonopposition of Newmont's Board of Directors, and will be financed in major part by a substantial dividend that Newmont intends to pay to all shareholders, including Ivanhoe.

Gold Fields' present 49.7% stock interest, including the 23% block it acquired in the street sweep, was made subject to certain restrictions on voting and transfer. Those restrictions were imposed by a standstill agreement entered into between Newmont and Gold Fields the day before the street sweep. Those restrictions, it is claimed, will entrench Newmont's Board of Directors and preclude any future takeover bid for Newmont. On that and other grounds it is argued that the defensive measures adopted by the defendants constitute inequitable entrenchment devices in violation of the defendants' fiduciary duties under Delaware law.

For the reasons now stated, I conclude preliminarily that, except in one particular, the challenged transactions have not been shown to violate any Delaware law or fiduciary principle. I further conclude that in the peculiar circumstances of this case, no preliminary injunctive relief is required.

## I. PROCEDURAL BACKGROUND

This preliminary injunction motion comes to be heard after frenetic and intense activity over an extremely short period—10 days from the filing of the complaint to the oral argument. During that intervening period two temporary restraining order motions were heard and decided.

In early September of this year, prompted by Newmont's opposition to Ivanhoe's takeover bid, numerous class action lawsuits were filed on behalf of Newmont stockholders, against Newmont, its directors, and Gold Fields. On September 17, 1987, those class actions were consolidated into Civil Action No. 9221.

On the morning of September 22, 1987, in response to a public announcement that Gold Fields would seek to acquire an additional 23% of Newmont's publicly held stock, Ivanhoe filed Civil Action No. 9281

---

1. *Securities and Exchange Commission v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945 (9th Cir. 1985) ("defensive" street sweep by target corporation held not violative of Williams Act); *Hanson Trust PLC v. SCM Corporation,* 774 F.2d 47 (2d Cir.1985) ("offensive" street sweep by hostile acquiror held not violative of the Williams Act);

but see, *Wellman v. Dickinson,* 475 F.Supp. 783 (S.D.N.Y.1979), *aff'd,* 682 F.2d 355 (2d Cir.1982); *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983) (street sweep by hostile acquiror under circumstances found to constitute "tender offer" in violation of Williams Act).

against Newmont, its directors, and Gold Fields, and immediately moved for a temporary restraining order and a preliminary injunction to prohibit Gold Fields from making those purchases. Ivanhoe's motion for a temporary restraining order (of which notice was duly given) was argued at 2:00 p.m. that same afternoon. The following morning, the Court entered an order temporarily restraining Gold Fields from purchasing additional Newmont stock. By that point Gold Fields had bought all but a small fraction of the desired 23% block. Although not yet consummated, those purchases were to "settle" early the following week.

On the motion for a temporary restraining order, the record, while skeletal, did indicate that the "street sweep" would make Gold Fields the owner of 49.7% of Newmont. It further appeared that Gold Fields' open market purchases, besides defeating the Ivanhoe offer, might also operate to entrench Newmont's Board and render Newmont "takeover proof" for up to 10 years, because of certain provisions in a standstill agreement between Gold Fields and Newmont. That agreement required Gold Fields to vote its Newmont stock for Newmont's director nominees, and substantially restricted Gold Fields' ability to transfer its Newmont shares to a third party free of the standstill restrictions. The Court ruled that on the limited record before it, those actions were "sufficiently indicative of a possible fiduciary violation by Newmont's directors (aided and abetted by Gold Fields) and of imminent irreparable harm as would justify a temporary restraining order." *Ivanhoe Partners, et al. v. Newmont Mining Corporation, et al.,* Del.Ch.C.A. No. 9281, Jacobs, V.C. (September 28, 1987), at 3-4 [Available on WESTLAW, DE–CS database].

When the temporary restraining order was entered, Ivanhoe moved to enlarge the order to prevent Gold Fields from consummating the approximately $1.6 billion of stock trades for which it had previously contracted. That motion was briefed, and then argued four days later, on Friday, September 25, 1987. On Monday morning, September 28, 1987, this Court issued its Opinion denying Ivanhoe's motion, thereby allowing Gold Fields to consummate the contracted-for Newmont stock purchases. However, the Court directed that those shares not be voted and that they be either "held separate" or placed into escrow, *pendente lite,* conditioned upon Ivanhoe agreeing not to take any further action until this preliminary injunction motion was decided, except to extend the duration of its tender offer or complete financing arrangements. (*Ivanhoe Partners, et al. v. Newmont Mining Corporation, et al., supra* at 17; Order dated September 28, 1987.) Ivanhoe agreed to that condition and Gold Fields elected to hold separate its recently purchased Newmont shares.

Three days later, on October 1, 1987, following expedited discovery and the filing of extensive briefs, the motions for a preliminary injunction were argued. This is the decision of the Court on the plaintiffs' motions for preliminary injunctive relief.

## II. FACTUAL BACKGROUND [2]

Due to the nature and number of issues presented (requiring almost 400 pages of briefing), a somewhat extended treatment of the factual background is appropriate. All of the critical events took place over a relatively short period—five weeks spanning August 13 through September 22, 1987.

Newmont, a Delaware corporation and diversified natural resources company, is one of the largest producers of gold in North America. Newmont has issued and outstanding approximately 67 million shares of common stock that are listed and traded on the New York Stock Exchange. Newmont's largest stockholder is Gold Fields, which, prior to its stock purchases on September 21–22, 1987, owned 26.2% of Newmont's stock. Gold Fields is a multi-

---

2. Except where otherwise noted, the underlying facts are not disputed. Where there are disputes, those disputes are treated appropriately, *i.e.,* with due regard for the limitations of the preliminary injunction procedure, including its constraints upon fact-finding. (*See, e.g.* pages 607–608 *infra*).

national producer of gold, with interests and operations in South Africa, Australia, and the United States. Gold Fields' principal holding company, Consolidated Gold Fields PLC, is a United Kingdom corporation. Defendants Gold Fields American Corporation, and The Special Purpose, Inc., both Delaware corporations, are subsidiaries of Consolidated Gold Fields PLC.

Newmont has a nine person Board of Directors, consisting of three "inside" directors who comprise Newmont's top management, two directors who are affiliated with Gold Fields, and four "outside" directors who are not affiliated with either Gold Fields' or Newmont management.[3]

### A. *Relationship Between Newmont and Gold Fields*

To fully understand the present controversy, a brief discussion of the historical relationship between Newmont and Gold Fields is helpful.

In 1981 Gold Fields began acquiring Newmont stock. Gold Fields disclosed that it intended to acquire at least 25% but less than 50% of Newmont. Newmont resisted by (among other things) commencing litigation to block Gold Fields' effort to purchase a significant stock interest. Ultimately Newmont and Gold Fields resolved their dispute by negotiating an agreement pursuant to which Gold Fields bought one million shares of stock directly from Newmont, and thereafter increased its stock interest by open market purchases to 26%.

Newmont and Gold Fields also entered into a three-year standstill agreement which was amended in 1983 (the "1983 standstill agreement"). That agreement contained several important provisions which restricted Gold Fields' right to vote its Newmont stockholdings and to transfer its stock to a third party. Specifically, Gold Fields was prohibited from acquiring more than 33⅓% of Newmont's stock at any time before October 31, 1993 without the consent of the Newmont Board. Gold Fields was also generally limited to one third of the seats on the Newmont Board, and the agreement required that at least one more than the number of Gold Fields directors had to be independent. Gold Fields was required to vote its shares for the Newmont's slate of director-nominees, and was prohibited from mounting a proxy contest in opposition to Newmont's slate, so long as the Newmont Board supported the Gold Fields nominees. The 1983 standstill agreement also gave Newmont a right of first refusal in the event Gold Fields decided to sell its Newmont stock. The term of the 1983 standstill agreement was until November 1, 1993 or until the happening of certain earlier events, including a third party acquiring 9.9% or more of Newmont stock. If that latter event occurred, Gold Fields, would be entitled unilaterally to terminate the agreement by giving appropriate notice.

These arrangements governed the legal relationship between Gold Fields and Newmont until September 20, 1987. According to the affidavits of Gold Fields officials, the relationship between the two companies, while acceptable, was not totally cordial. Newmont's management apparently viewed Gold Fields as an outsider having its own separate agenda, and in the relationship there was an element of mistrust. Although Gold Fields had minority board representation, its designees on the Newmont Board were given no information other than that received by every other director. There was very little operational contact between Newmont and Gold Fields.

---

**3.** Newmont's "inside" directors are defendants Gordon R. Parker (Newmont's Chairman and a Director of Consolidated Gold Fields PLC), Edward P. Fontaine (Newmont's Chief Financial Officer) and Richard B. Leather (Newmont's General Counsel and Executive Vice President). The "Gold Fields" directors are defendants Rudolph I.J. Agnew and Robin A. Plumbridge, who are (respectively) the Chairman and Group Chief Executive of Consolidated Gold Fields PLC and Chairman and Chief Executive Officer of Gold Fields of South Africa, Ltd. The independent directors of Newmont are defendants Joseph P. Flannery (Chairman and Chief Executive Officer of Uniroyal Holdings, Inc.), Thomas A. Holmes (Chairman and Chief Executive Officer of Ingersoll–Rand Company), William B. Moses, Jr., (retired Chairman of Massachusetts Financial Services Company) and William I.M. Turner (Chairman and Chief Executive Officer of Consolidated–Bathhurst, Inc.)

Nonetheless, between 1983 and August 1987, this alliance between the two companies remained stable, and after 1983 it apparently somewhat improved, as evidenced by Gordon Parker, Newmont's Chairman, becoming a member of Gold Fields' Board.

## B. *The Emergence of Ivanhoe*

On August 13, 1987, Ivanhoe disclosed in a Schedule 13D filed with the Securities and Exchange Commission ("S.E.C."), that it had purchased approximately 8.7% of Newmont's outstanding shares. Plaintiff Ivanhoe Partners is a Texas general partnership, and plaintiff Ivanhoe Acquisition Corporation is a Delaware corporation that was specially formed to make a tender offer for Newmont shares. Ivanhoe is controlled by certain entities including Mesa Holding Limited Partnership, which, in turn, is controlled by Mr. T. Boone Pickens, Jr. When Ivanhoe filed its Schedule 13D, Mr. Pickens, on behalf of Ivanhoe, also sent letters to Newmont's Gordon Parker and Gold Fields' Rudolph I.J. Agnew, stating that Ivanhoe would "welcome the opportunity to meet ... to discuss alternatives for advancing the interests of all parties." By letter dated August 19, 1987, Mr. Agnew responded to Mr. Pickens, stating that he did not believe such a meeting would serve a useful purpose.

On August 18, 1987, Ivanhoe publicly announced, through an amended Schedule 13D filing, that it had increased its stockholdings in Newmont to 9.95%. The significance of that disclosure is that Ivanhoe's new level of stock ownership exceeded the 9.9% threshold which, once crossed, would entitle Gold Fields to terminate the 1983 standstill agreement unilaterally, and (if it so chose) to pursue control of Newmont either alone or in alliance with Ivanhoe or some other bidder.

Both Newmont and Gold Fields were acutely aware—and both acknowledged—that by crossing the 9.9% threshold, Ivanhoe had triggered Gold Fields' right to terminate the 1983 standstill agreement and purchase additional Newmont shares in the open market.[4] That same day (August 18) the Newmont Board of Directors met and discussed Gold Fields' position in the matter. Mr. Agnew advised that Gold Fields was prepared to support Newmont's management in appropriate circumstances and at that time would take no precipitate action that might be viewed as hostile. But Mr. Agnew cautioned that Gold Fields reserved the right to act independently and in its own interest, which might include "doing a deal with Mr. Pickens." (Agnew Aff., ¶ 7). In a press release issued that same day, Gold Fields disclosed that it had the right to terminate the 1983 Standstill, but did not intend to exercise that right "at this time."

Ivanhoe's actions on and after August 18, 1987 led to a series of defensive reactions by Newmont[5] and Gold Fields, and countermoves by Ivanhoe, all of which eventuated in the transactions that are the subject of this litigation. To appreciate the significance of those actions and reactions, an explanation of how Newmont and Gold Fields each viewed the situation from its own perspective is in order.

Newmont's directors perceived that Ivanhoe, by triggering Gold Fields' right to terminate the 1983 standstill agreement, made Newmont and its public shareholders immediately vulnerable to a dual risk. The risk was that Ivanhoe, or Gold Fields, or

---

4. By reason of Gold Fields' charter and the Hart–Scott–Rodino Antitrust Act, Gold Fields could not increase its ownership interests beyond 49.9% unless it obtained shareholder approval and clearance from the London Stock Exchange and the United States Department of Justice. The record indicates that such approvals could be obtained in a matter of weeks.

5. The first reaction was to approve, at the August 18, 1987 Newmont Board meeting, "golden parachute" agreements with 25 key members of management. Those agreements called for sub-

stantial severance payments if an entity other than Gold Fields acquired more than 20% of Newmont's outstanding stock, or if Mr. Parker determined that a takeover was imminent. Mr. Parker activated those agreements at the Newmont Board meeting held on September 10, 1987, two days after Ivanhoe commenced its hostile tender offer. As a consequence, Newmont paid $37 million into certain trust funds that had been created to fund the agreements. The validity of those agreements is not an issue presently before the Court.

both acting in concert, would acquire majority stock control of Newmont, leaving Newmont's minority stockholders without protection against a subsequent "freeze out" merger or other transaction at an unfair price. Ivanhoe disputes the *bona fides* of that claimed perception. But, as discussed elsewhere (See Part IV E, *infra*, of this Opinion), the record, when viewed as a whole, supports the conclusion that Newmont's directors had reasonable cause for concern. The Newmont directors' concerns account for the "two front" strategy that they employed in responding to the perceived threats from both Ivanhoe and Gold Fields. The record fairly establishes that very early on, Newmont's management and Board had made two basic decisions: (i) a decision not to "sell the company" but to keep it independent (Parker Aff., ¶ 18), and (ii) a decision to oppose and defeat any effort by Ivanhoe to take control of Newmont. All steps taken by Newmont from and after August 18, 1987 were consistent with those objectives.

The record also fairly establishes that Gold Fields' interests diverged from Newmont's, and that Gold Fields had its own separate agenda. Gold Fields saw itself as having three options. The first was for Gold Fields to sell its stock interest to Ivanhoe at a profit. The problem with that approach, however, was that it was inconsistent with Gold Fields' business objective of remaining primarily an international gold company.[6] Moreover, any sale of Gold Fields' Newmont shares would have highly adverse tax consequences that would significantly reduce the net proceeds received by Gold Fields. Nonetheless, a sale of Gold Fields' investment in Newmont, while not favored, was viewed as a "fall back position." (1st Hitchens Aff., ¶ 24).

Gold Fields' second alternative was to terminate the 1983 standstill agreement and to buy sufficient Newmont stock in the open market to obtain voting control. Indeed, throughout this period Gold Fields' investment banker, The First Boston Cor-

poration ("First Boston"), persistently and strenuously urged that precise course. The problem with that approach was that Gold Fields' management was at that point reluctant to invest a very large sum of money to purchase additional Newmont shares. Management's preferred strategy was to preserve its position in Newmont without making a large investment of its own resources. Moreover, terminating the 1983 standstill agreement without at least exploring "friendly" alternatives was viewed as inconsistent with the relationship that Gold Fields had tried so hard to cultivate with Newmont since 1981. The standstill agreement also contained favorable provisions (*e.g.*, a limitation on the dilution of its position through issuance of new shares) that Gold Fields valued quite highly.

Those negative considerations were not, however, thought of as insurmountable obstacles. Gold Fields could take control of Newmont by obtaining 49% of Newmont's outstanding stock, and then by soliciting consents to remove the Newmont Board and replacing it with Gold Fields' nominees. The new Board would then declare and pay to all stockholders a large cash dividend that would, in effect, finance Gold Fields' purchase of the additional Newmont stock. (1st Hitchens Aff., ¶ 28)

Gold Fields' third option was to effect a "friendly", mutually advantageous transaction with Newmont. It soon became clear, however, that the *quid pro quo* for any such arrangement would be Gold Fields' having to agree to more stringent standstill provisions than those already contained in the 1983 standstill agreement. (1st Hitchens Aff., ¶ 25).

Between August 13 and September 17, 1987 Gold Fields' directors continually assessed these alternatives. Although during that period Gold Fields publicly supported Newmont's management, privately Gold Fields was actively considering all of its options. One proposition, however, was

---

6. For Gold Fields it was vitally important to have significant gold holdings and investments in North America. To be left as primarily a South African gold company would adversely affect Gold Fields' world market position and its standing in the United Kingdom stock market.

594

always clear: at no time did Gold Fields consider it acceptable to remain as a minority stockholder in an Ivanhoe-controlled Newmont. If, in any joust to win the hand of Lady Newmont, Ivanhoe was to emerge as the victorious knight, Gold Fields had no intention of remaining as the subservient squire.

### C. *Initial Reactive Measures*

Shortly after August 18, Mr. Parker (Newmont's Chairman) together with Richard B. Leather (Newmont's General Counsel) and a representative of Goldman, Sachs & Co. ("Goldman Sachs") one of Newmont's investment bankers, flew to London apparently in an effort to persuade Gold Fields to join cause with Newmont to defeat Ivanhoe's anticipated takeover effort. At a Gold Fields Board of Directors meeting held on August 21, 1987, Mr. Parker advised that Newmont intended to resist vigorously any attempt by Ivanhoe to obtain control. Several possible proposals were discussed, all involving, in one form or other, Gold Fields purchasing additional Newmont stock either on the open market or by exchanging certain Gold Fields assets for Newmont shares. At that meeting Gold Fields made no commitments. Mr. Agnew did express support for Newmont's management, but at all times Gold Fields was (to repeat) continuously assessing its options and potential strategies.

On a parallel front, Newmont's management, anticipating that it might soon become necessary to develop economic alternatives to an Ivanhoe-proposed transaction and that it might be important to determine Newmont's value, accelerated Newmont's already ongoing annual planning process. On August 27, 1987 Newmont issued a press release, and sent a letter to its shareholders, in which the company reported a 14% increase in gold reserves, a 45% increase in production forecasts by its 90–

percent owned subsidiary, Newmont Gold Company, and an aggressive program to achieve those increased production objectives. The gold production forecast for 1987 was 585,000 ounces; for 1988 the forecast was for 850,000 ounces; and for 1989, the forecast was for one million ounces.

On August 31, 1987, Mr. Pickens, on behalf of Ivanhoe, sent Mr. Parker a "bear hug" letter proposing that Ivanhoe acquire all of the remaining Newmont common stock in a negotiated transaction. By a separate letter, Pickens also invited Gold Fields' Mr. Agnew to discuss "a broad range of alternatives to [Gold Fields'] sale of interest in Newmont," including Gold Fields' possibly retaining its minority interest in Newmont or acquiring specific Newmont assets in exchange for its Newmont stock. At that point Ivanhoe had no in-place commitments for the $6.25 billion of financing that a $95 per share partial acquisition of Newmont would have required.

Between September 1 and September 8, Newmont's Board met three times, and the Gold Fields' Board met once, to explore possible strategies and responses.

At the September 1, 1987 Newmont Board meeting, Newmont's investment bankers [7] discussed the available financial alternatives with the Board. At that and later meetings the Newmont Board considered (and ultimately rejected) numerous alternative defensive transactions. One alternative that was discussed (and ultimately adopted) was the payment of a large cash dividend which, it was believed, would reduce Newmont's liquidity, disrupt Ivanhoe's financing, and (as an intended result) "maybe Pickens goes away." Another alternative discussed (and ultimately adopted) was to persuade Gold Fields to

7. At this point Newmont formally engaged financial and legal advisors. Newmont retained Goldman Sachs and Kidder, Peabody & Co., Incorporated ("Kidder Peabody") to act as financial advisors. It also retained the New York firm of Wachtell, Lipton, Rosen & Katz, as well as its regular counsel, White & Case, and the Wilmington firm of Potter Anderson & Corroon, to act as legal advisors. At the request of one of the independent directors, the New York firm of Debevoise and Plimpton was also retained to act as counsel for the four independent directors. These legal and financial advisors attended many of the Newmont Board meetings which are described herein.

increase its investment in Newmont to a less-than-51% level. But as of September 1, those matters were still for the future. Gold Fields' position remained noncommittal. Newmont's Board, however, instructed Newmont management to explore with Gold Fields possible transactions of potential mutual interest to both companies.

On September 2, 1987 Gold Fields held a special Board of Directors meeting in London to discuss the Newmont situation, Ivanhoe's $95 per share "bear hug" proposal, and potential responses. A divergence of views developed between the Gold Fields executive ("inside") directors and the non-executive ("outside") directors, over whether Gold Fields should sell its investment in Newmont or whether it should take whatever steps were required to protect that investment from "the unwelcome attentions of Mr. Pickens," including actions "not consonant with the wishes of Newmont's officers and directors." (Agnew Aff., ¶ 6). Resolving those dissonant views involved a process that required several weeks. Meanwhile no final decisions were made until at least September 17, 1987. During that entire period Gold Fields continued to manifest its apparent willingness to discuss all reasonable proposals with Newmont and Mr. Parker, while at the same time continuing to reserve its freedom to act independently and in its own interests.[8]

In furtherance of its effort to generate financial alternatives to Ivanhoe's by-then-anticipated hostile tender offer, Newmont's management continued to develop an aggressive business plan and capital investment program. Management's program (described by defendants as the "Gold Plan") involved raising Newmont's 1988 gold production estimates by 50% above 1987 levels.[9] The Gold Plan was presented to and discussed by the Newmont Board at its meeting held on September 7, 1987, but was not formally approved until the Board meeting of September 10, 1987. At the September 7 meeting, the Newmont Board also approved a revolving $2.25 billion credit facility agreement between Newmont and a syndicate of banks. That agreement provided that the loans could be deemed in default if an entity other than Gold Fields acquired 50% or more of Newmont.

### D. *The Ivanhoe Tender Offer and Reactions Thereto*

On September 8, 1987, Ivanhoe commenced a partial cash tender offer for 28 million shares (42%) of Newmont stock at $95 per share, which was intended to bring Ivanhoe's Newmont holdings up to 51%. Although the Offer to Purchase disclosed that Ivanhoe would seek to acquire all Newmont shares not purchased in the offer in a "second step" transaction at $95 per share cash, there was no firm commitment to conduct such a second step. Ivanhoe's Offer to Purchase disclosed that the second step transaction was subject to obtaining sufficient financing and that no specific proposal for a second step transaction (oth-

---

**8.** Mr. Agnew's own privately held view, which ultimately prevailed, was that Gold Fields should retain its Newmont investment even at a high cost. Because of the Gold Fields executive directors' concerns about making a significant expenditure, Mr. Agnew authorized Gold Fields' management to explore possible transactions in cooperation with Newmont that would eliminate or reduce Gold Fields' cost of increasing its holdings in Newmont. Accordingly, ongoing discussions between Gold Fields and Newmont representatives took place throughout this period.

**9.** As finally announced on September 11, 1987, the Gold Plan called for an increase of gold production to a level of 1.6 million ounces annually by 1990, and for accelerating exploration

and reserve activities. Those increased estimates provided a basis for Newmont's investment bankers to increase their initial valuation of Newmont stock. Plaintiffs suggest that the increased estimates were made solely to inflate the valuations, in order to justify Newmont's directors taking the position that Ivanhoe's offering price(s) were inadequate. Plaintiffs also argue that that the increased estimates lacked any objective financial basis. It seems clear that the Newmont Gold Plan and the increased production estimates were part of Newmont's strategy to defeat Ivanhoe, and that they were timed with that objective in mind. The present record does not, however, support a conclusion that these increased estimates were made without an objective financial basis.

er than the consideration to be offered) had yet been determined.[10]

On September 10, 1987, the Newmont Board met to consider the Ivanhoe offer. At the meeting, Goldman Sachs summarized its financial analysis of the Ivanhoe offer and discussed certain valuations of Newmont. Based in part on that analysis, the Board concluded that the $95 per share partial offer was inadequate, and voted to recommend that Newmont's stockholders reject it.[11]

From September 8 (when the Ivanhoe offer commenced) through September 20 (when the transactions under challenge were formally agreed to) neither Mr. Agnew nor Mr. Plumbridge attended any Newmont Board meeting other than the final portion of the September 20, 1987 meeting, after the Newmont/Gold Fields standstill agreement had been entered into. As a result, neither of Gold Fields' representatives on the Newmont Board became privy to any information disclosed at those meetings, including presentations made by Newmont's investment bankers.

By about September 11, Gold Fields' management began considering more seriously the possibility of terminating the 1983 standstill agreement and making a sizeable additional investment in Newmont. To prepare for that contingency, Messrs. Agnew and Plumbridge signed undated resignations from the Newmont Board, as well as a formal notice of termination of the 1983 standstill agreement. Those documents were kept in New York for immedi-

ate delivery to Newmont in the event that Gold Fields chose to adopt that course of action.

On Sunday evening, September 13, 1987, Gold Fields management met. By that point Mr. Agnew had concluded that the exploratory talks aimed at working out a mutually satisfactory arrangement with Newmont had produced no concrete results. Agnew proposed (and the executive directors agreed) that plans should be developed to commit Gold Fields' own funds to the purchase of Newmont stock. At a Gold Fields Board meeting held the next day, the Board directed Mr. Agnew "to stiffen our resolve to stay in Newmont and see Mr. Pickens out." (Agnew Aff., ¶ 13). Accordingly, Mr. Agnew began exploring ways of raising the necessary funds to purchase shares sufficient to increase Gold Fields' stake in Newmont to between 40% and 49%. Over the next few days Gold Fields' management consulted with Mr. Joseph Perella of First Boston to discuss how the necessary funds might be raised.

Throughout this period Gold Fields representatives continued negotiating and exploring (with their opposite numbers at Newmont) possible joint transactions on mutually satisfactory terms. By September 16, after Gold Fields' advisors informed Mr. Agnew that their latest negotiation with Newmont over "a possible friendly deal coupled with a standstill," had broken down, Mr. Agnew advised his confederates that "it was time to find other partners,

---

**10.** The following day (September 9) Ivanhoe delivered to Newmont written consents to reduce the number of Newmont directors to three, and nominating three persons for those positions.

**11.** The Board rejected the Ivanhoe offer for the stated reasons that: (i) the offer was inadequate in relation to the inherent values in the company, which values had been materially enhanced by the adoption of the Gold Plan, (ii) shareholder interests would be best served by Newmont remaining independent so that shareholders could reap the benefits of the company's expected future profitability, (iii) the Ivanhoe offer had uncertainties and was potentially coercive, because of the absence of any commitment for a "second step" acquisition, and (iv) the Board believed that it was in a better position to adopt an alternative restructuring program that would

provide greater short term value to shareholders while permitting them to share in Newmont's long run profitability.

On September 11, 1987, Newmont filed a Schedule 14D with the S.E.C. disclosing the director's conclusion that the Ivanhoe $95 offer was inadequate for the above reasons. Newmont also issued a press release to that same effect, and which disclosed also the adoption of the Gold Plan. In its press release, Newmont also disclosed that it had (a) arranged the $2.25 billion credit line, (b) adopted a by-law that would prohibit action by written consent from becoming effective for at least 20 days from the date of the commencement of a solicitation and distribution of solicitation materials, and (c) filed an action against Ivanhoe in the United States District Court for Nevada charging Ivanhoe with violations of the Federal Securities Laws.

stand up for our rights, and go hostile." (Agnew Aff., ¶ 16). By September 17, 1987, Mr. Perella had indicated that First Boston would advance the necessary financing for large share open market purchases. (*Ibid.*, ¶ 17).

On September 16, 1987, Ivanhoe amended its tender offer, increasing the offering price to $105 per share. Two days later, on September 18, 1987, the Newmont Board met to consider Goldman Sachs' revised financial analysis of the amended Ivanhoe offer, as well as potential responses. Based on the revised analysis, both Goldman Sachs and Kidder Peabody concluded that Ivanhoe's amended $105 per share partial offer was still inadequate.[12]

### E. *Development of the Transactions Presently Under Challenge*

Also discussed at the September 18 Newmont Board meeting were various potential alternative responses to the Ivanhoe offer. The principal focus of that meeting, however, was a "restructuring" proposal that Newmont's management had developed and recommended and had apparently communicated to Gold Fields the day before.

The proposed restructuring program involved Newmont declaring a nondiscriminatory $33 per share dividend and selling its nongold assets to finance the dividend, thereby leaving Newmont with its core gold business. Management believed that in the near term, the dividend would provide shareholders with greater value than the face value of the Ivanhoe offer, while in the long term it would permit stockholders to participate in the company's future growth. The dividend would also put money into Gold Fields' hands that could be used to make open market purchases at an overall relatively low cost. But the proposal was clearly a two-edged sword: Gold Fields ownership of 49.9%, while vanquishing Ivanhoe, would also position Gold Fields to wrest control of Newmont with potential jeopardy to the public stockholders' investment. Accordingly, the Board resolved that before any dividend was declared, a new standstill agreement had to be negotiated with Gold Fields.

Over the ensuing weekend, intensive efforts were made to negotiate a standstill agreement with Gold Fields. (Negotiations between those parties for a standstill agreement had been sporadic—and unsuccessful—since August 16). Newmont's proposal to pay a $33 per share dividend broke the impasse, since the dividend would enable Gold Fields to buy up to 49.9% of Newmont for a relatively low average cost. The negotiations conducted were at arm's length, with each side insisting that the standstill agreement and the dividend[13] be the *quid pro quo* for the

---

**12.** The earlier analysis prepared by Goldman Sachs for purposes of evaluating Ivanhoe's earlier $95 offer had resulted in values of $103 to $107 per share. Those sums were not intended to represent Newmont's "fair value," but were estimated proceeds that might be derived from a sale of Newmont's assets at their fair market value. Those values did not take into account the impact of the Gold Plan that was announced on September 11. The Goldman Sachs September 18th presentation was based upon the revised September 11 figures, which did take into account the impact of the Gold Plan, as well as other more current information. The range of the revised values, was $110 to $114 per share, the increase being attributable almost entirely to the increase in the publicly traded stock price of Newmont Gold Company. Based on its analysis, Goldman Sachs opined that if Ivanhoe acquired all of Newmont (and thereafter sold the nongold assets) at a $95 per share price, it would acquire the gold companies at a 13.8% discount to their current market value. At a price of $105 per share, Ivanhoe would acquire

those companies at a discount of 8.7% to their current market value. (Mendell Aff., ¶¶ 6–9). Plaintiff also challenges the integrity of the revised valuations on the ground that they were conveniently timed in response to Ivanhoe's increased offer and because their basis—an increase in Newmont Gold's stock market prices occasioned by the announcement of the Gold Plan only one week before—is questionable. What plaintiffs appear to suggest is that Goldman Sachs based its analysis not upon "real" values but on apparent values created by the manipulation of market prices through the careful timing of "good news." While it is possible that that contention might be validated at a final hearing, on this preliminary injunction record the plaintiffs' challenge to the Goldman Sachs valuation is without sufficient evidentiary support.

**13.** According to Mr. Parker (Parker Aff., ¶ 34) $33 per share represents the approximate value of the assets that would have to be divested in order to transform Newmont into a purely gold

other. An agreement was apparently finalized on Sunday, September 20, 1987, shortly before the Newmont Board meeting scheduled for that same afternoon.

At the September 20 Newmont Board meeting (from most of which Messrs. Agnew and Plumbridge had absented themselves), two critical decisions were made. The first was to recommend that Newmont shareholders reject the $105 Ivanhoe amended offer on the basis that it was inadequate for reasons of·price and for the other reasons previously described. (See notes 11 and 12, *supra*). That decision was made in reliance upon the presentations and opinions of Goldman Sachs and Kidder Peabody.

Second, the Board voted to approve the new standstill agreement (referred to herein as "the September 20 standstill agreement"). After the vote, the new September 20 agreement was executed by both companies, and at Gold Fields' insistence, it was delivered to Newmont in escrow, conditioned upon Newmont's declaring the $33 per share dividend. Messrs. Agnew and Plumbridge then joined the meeting but abstained from voting on the otherwise unanimously approved dividend and other "restructuring" transactions.[14]

Shortly thereafter, Gold Fields and Newmont made the requisite filings with the S.E.C. disclosing the above-described corporate actions. In its amended Schedule 13D, Gold Fields disclosed that it intended to increase its ownership in Newmont from 26.2% to 49.9% through open market purchases and negotiated transactions. In response to those disclosures, Ivanhoe adjusted its $105 offering price to $78 to account for the $33 dividend, with the result that the dividend ($33), added to the adjusted offering price ($78) would equal $105.

On September 21 and 22, 1987 Gold Fields authorized its investment banker, First Boston, to buy 23.7% of Newmont's outstanding shares on the open market or through negotiated purchases. First Boston bought 15,799,000 shares at an average price of approximately $98 per share, for a total investment of approximately $1.6 billion. (Those purchases are the "street sweep" under challenge in this litigation.) As a result, Gold Fields now owns 49.7% of Newmont's outstanding shares which, when combined with .5% owned by Newmont's management, constitutes majority control.

Of critical importance is the fact that Gold Fields' entire 49.7% block of Newmont was made subject to the September 20 standstill agreement which, like the 1983 standstill, imposed acquisition, voting and transfer restrictions upon Gold Fields' Newmont stock. Specifically, the September 20 standstill agreement prohibited Gold Fields from acquiring Newmont stock in an amount that would bring Gold Fields' total ownership above 49.9% of Newmont's outstanding shares. Gold Fields remained free to vote its Newmont shares as it chose on matters other than the election of directors. However, it was required to vote all of its shares for the director slate proposed by Newmont's Board of Directors. Moreover, Gold Fields was prohibited from soliciting proxies in opposition to the Newmont Board's slate. Gold Fields was, however, entitled to designate the same percentage of directors to be elected as the percentage of Newmont voting stock that it held, up to a ceiling of 40% of the positions to be filled.

The September 20 standstill agreement also restricted Gold Fields' ability to transfer its Newmont shares to a third party

company with low debt. Plaintiffs argue that that figure conveniently results in Gold Fields receiving $1 billion of Newmont funds—precisely the amount of outside funding Gold Fields claimed it needed to increase its stake in Newmont. Insofar as this record shows, both of these claims (by Mr. Parker and by the plaintiffs) are correct.

**14.** In addition to approving the September 20 standstill agreement, Newmont's Board of Di-

rectors adopted a rights agreement, the purpose of which is to guarantee that if any person acquires 50% or more control and within the next two years effects a "second step" transaction, the remaining Newmont shareholders would be entitled to receive the highest price paid for the stock within the 91 day period before the controlling shareholder acquired its majority position.

free of those restrictions. During the first five years (until November 1, 1992) Gold Fields could not transfer Newmont shares that would result in the transferee having 9.9% of the voting power of Newmont, unless the transferee agreed to be bound by the standstill agreement. During the second five years (between November 1, 1992 and October 31, 1997) Gold Fields could not transfer Newmont shares that would amount to the greater of 9.9% of Newmont's outstanding voting stock or more than 50% of Gold Fields' then-holdings of Newmont stock, again unless the transferee agreed to be covered by the standstill agreement.

As previously discussed, the Court's concern as to the possible impact of the foregoing restrictions upon Gold Fields' 49.7% block of Newmont stock, led to the entry of temporary restraining orders prohibiting Gold Fields from making further purchases of Newmont stock and requiring Gold Fields to hold separate the Newmont shares purchased by it in the street sweep.

On September 25, 1987, apparently in response to the Court's expressed concerns, Newmont and Gold Fields unilaterally amended the September 20 standstill agreement. Defendants contend that the amendments have eliminated all features of the September 20 agreement that create any arguable potential for entrenchment. That newly-amended standstill agreement (herein referred to as the "September 25 standstill agreement"), and its effects, are addressed elsewhere in this Opinion.

### III. THE PLAINTIFFS' REQUESTED RELIEF AND LEGAL CONTENTIONS

Before outlining the plaintiffs' contentions, the Court will first describe the preliminary injunctive relief being requested. Essentially the plaintiffs seek by way of preliminary injunctive relief to prevent or undo (i) the $33 per share dividend and (ii)

Gold Fields' purchase of 23% of Newmont's stock in the street sweep.

The class plaintiffs (but not Ivanhoe) seek to enjoin Newmont from paying the dividend on the ground that the dividend, although not itself unlawful, was an integral part of the defendants' scheme and purpose to entrench themselves in office and, hence, should be invalidated.

In addition, all plaintiffs seek, basically, a preliminary mandatory rescission of the Gold Fields "street sweep" stock purchases. Ivanhoe proposes two alternative methods for rescission. The first method allows those stockholders who sold their Newmont stock to Gold Fields in the street sweep ("the selling stockholders") to buy back their Newmont stock by repaying Gold Fields its purchase price less any seller commissions and less the $33 dividend, if it has previously been paid. The selling sellers may then, at their option, either retain their shares, tender them into the Ivanhoe offer (or any other then-pending offer), or resell them in the open market. Under Ivanhoe's second rescission proposal, each selling stockholder would be allowed to instruct Gold Fields to tender the number of Newmont shares purchased from him into the Ivanhoe offer (or any other then-pending offer), after which Gold Fields would pay each selling shareholder the difference between the tender offer price and the purchase price paid by Gold Fields. All shares not thus tendered would belong to Gold Fields.[15]

In support of their requests for relief, the plaintiffs advance several contentions, all of which are based upon the plaintiffs' interpretation of the record. Plaintiffs factual slant is that the dividend, the street sweep, and the September 20 standstill agreement were integral parts of a single preconceived scheme by Newmont's Board and Gold Fields to defeat the Ivanhoe offer and any other potential hostile takeovers of Newmont, by "locking up" control of Newmont for ten years. The alleged "lock up"

---

**15.** The class plaintiffs propose additional injunctive relief going beyond the scope of that just outlined, *e.g.*, enjoining Newmont from drawing down funds under the September 9, 1987 credit agreement, requiring Ivanhoe to extend its tender offer for a reasonable period, and requiring Ivanhoe to provide stronger assurance of its intention to effect a "second step" acquisition (at the tender offer price) of all shares not purchased in its tender offer.

scheme included (i) Newmont declaring a dividend solely to finance Gold Fields' open market purchases of Newmont stock to bring Gold Fields' ownership up to 49.9%, and (ii) Gold Fields' subjecting its entire 49.9% block (which all parties agree is *de facto* control) to the restrictions of the September 20 standstill agreement. It is argued that the intended result of that scheme was to guarantee the continued incumbency of the Newmont Board or its nominees and to "lock up" voting control and thereby to prevent any future unsolicited efforts to acquire over 50% of Newmont's stock.

Plaintiffs contend that the above actions violated four separate fiduciary duties owed by Newmont's directors and for which Gold Fields is equally culpable either as a fiduciary or, alternatively, as an aider and abettor. *First,* the defendants are charged with using corporate assets and processes for the purpose of maintaining themselves in control, in violation of their duty of loyalty to Newmont's public stockholders. *Second,* the defendants are accused of breaching the fiduciary duties imposed upon them by *Revlon, Inc. v. MacAndrews & Forbes Holdings,* Del.Supr., 506 A.2d 173 (1986) ("*Revlon*"), (i) by effecting a "lock up" scheme that prevented a bidding auction which, in turn, would have resulted in Newmont shareholders receiving the highest available price for their shares, and (ii) by discriminating among contenders for control in refusing to negotiate with Ivanhoe and to provide Ivanhoe with the same value-related information that was provided to Gold Fields. *Third,* the defendants are claimed to have breached the fiduciary duties owed to the selling stockholders in the street sweep, in which (it is argued) Gold Fields (i) coerced the selling shareholders and (ii) used undisclosed material inside information. *Fourth,* the defendants are charged with having adopted defensive measures not responsive to any reasonably perceived threat to corporate policy and which, in all events, were unreasonable in relation to

whatever threat may have existed, thus violating the fiduciary duties imposed by *Unocal Corporation v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985) ("*Unocal*").

## IV. THE PROBABLE MERITS OF PLAINTIFFS' CLAIMS

■ To obtain the extraordinary remedy of a preliminary injunction, the plaintiffs must demonstrate a reasonable probability that they will succeed on the merits of their claims, that they will suffer imminent irreparable harm if preliminary injunctive relief is denied, and that the harm to the plaintiffs if relief is denied outweighs the harm to the defendants if relief is granted. *Revlon, Inc. v. MacAndrews & Forbes Holdings,* 506 A.2d at 179 (1986); *Gimbel v. Signal Companies,* Del.Ch., 316 A.2d 599, 602–03, *aff'd,* Del.Supr., 316 A.2d 619 (1974); *Sealy Mattress Co. of New Jersey, Inc., v. Sealy, Inc.,* Del.Ch., C.A. No. 8853, Jacobs, V.C. (July 20, 1987) at 20 [Available on WESTLAW, DE–CS database].

In this case the defendants concede the plaintiffs' claim of irreparable harm, but contend that the plaintiffs have failed to show that they will probably succeed on the merits of their claims. The defendants also argue that the plaintiffs' claims, even if preliminarily established, do not justify the kind of temporary injunctive relief that is requested here. For the reasons now discussed, I conclude that, with one exception, the plaintiffs have failed to demonstrate probable success on the merits of their claims of fiduciary wrongdoing. As for the claim on which plaintiffs have shown a probability of success, the requested injunctive relief must be denied, because such relief would be excessive in relation to—and not needed to prevent—the threatened irreparable harm.

### A. Plaintiffs' "Entrenchment Motive" Arguments [16]

■ The plaintiffs attack the challenged transactions on two distinct levels: the lev-

---

**16.** Because the plaintiffs' "entrenchment motive" arguments are asserted as grounds for in-

validating both the dividend and the street sweep, those arguments are addressed first in

el of the defendants' underlying subjective intent in effecting the transactions, and the level of the objective effect of the transactions themselves. The intent/effect distinction may be important, in that the analysis may differ depending upon which doctrine is employed. Under the "subjective intent" approach, the challenged transactions, even if otherwise lawful, may be invalidated if they are found to have been employed for an inequitable purpose, such as perpetuating the directors in control. *See, e.g., Schnell v. Chris Craft Industries, Inc.,* Del.Supr., 285 A.2d 437, 439 (1971); *Bennett v. Propp,* Del.Supr., 187 A.2d 405, 409 (1962). A court using that approach would focus primarily upon the subjective motivation of the decision makers, rather than upon the legality or effect of the transactions themselves. Under the "objective effect" approach, however, the decision makers' subjective intent becomes largely irrelevant, the pivotal inquiry being instead upon whether the specific transactions are themselves unlawful or, if lawful, whether their effect is inequitable. *See, e.g., Unocal Corporation v. Mesa Petroleum Co.,* 493 A.2d at 955–957; *AC Acquisitions Corp v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103, 114–115 (1986); *Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906, 914 (1980).

■ Assuming that a "subjective intent" analysis is legally appropriate in this particular context,[17] the plaintiffs' inequitable purpose arguments must be rejected, because their factual predicate—that the challenged transactions represent a unified entrenchment scheme motivated by a single, dominant entrenchment purpose—is not adequately supported by the record.

The factual premise of plaintiffs' argument is that once Ivanhoe surfaced, Newmont's Board and Gold Fields immediately joined forces to enable Gold Fields to acquire sufficient stock to obtain voting control, and Gold Fields then delivered that control to Newmont's Board, all for the specific, deliberate purpose of entrenching the Board and preventing future takeover attempts. In fact, (see Part II, *supra*), and as explained more fully below, that is not how the scenario unfolded. The motivations of the players were far more subtle and complex. Newmont's Board, was to be sure, endeavoring to prevent hostile takeovers by Ivanhoe or Gold Fields on terms that might jeopardize the public stockholders' investment. Nor was Gold Fields a willing cat's-paw for the Newmont Board, standing by on a moment's notice to do the Board's bidding and "buy up voting control" upon being paid a dividend of $1 billion of Newmont funds. Defendants' description of Gold Fields as a "tiger let out of a cage" is the more apt metaphor. Like Ivanhoe, Gold Fields was a potential bidder for control with objectives potentially adverse to those of Newmont's Board. Only after weeks of separate and mutual exploration of options and arm's-length negotiations did the two companies manage to arrive at an accord. As later discussed, the great part of what the defendants agreed to and did appears (preliminarily) to have been proper. Some aspects of the standstill agreement, because of their entrenchment effect, were not. Putting that agreement to one side, the Court cannot conclude on this record that the defendants were motivated by an overriding subjective intent to entrench themselves.[18] Rather,

Subpart A of Part IV. The challenge to the legality of the dividend on other grounds is treated in Subpart B. The plaintiffs' remaining arguments, all asserted as grounds for invalidating the street sweep, are dealt with in Subparts C (the *Revlon* argument), D (the inside information and coercion arguments), and E (the *Unocal* argument).

17. The plaintiffs' "entrenchment intent" argument raises a question of whether it is any longer permissible, after *Unocal Corporation v. Mesa Petroleum Co., supra,* to challenge the propriety of defensive antitakeover measures on

the basis of the defendant fiduciaries' subjective intent. That issue was not raised by the parties, and, given the disposition of plaintiffs' "subjective intent" argument, it need not be addressed here.

18. That is not to say, however, that the issue is entirely free from doubt. The plaintiffs point to several actions by the Newmont directors—the "golden parachute" agreements, the credit facility agreement and its default provision (triggered by anyone other than Gold Fields acquiring over 50% control), the by-law amendment restricting the use of stockholder consents, and

Gold Fields and the Newmont Board were each motivated to—and did—act for their own independent, business-related reasons.

## B. *The Validity of the Dividend*

The class plaintiffs seek preliminarily to enjoin the dividend on the ground that it was enacted in furtherance of the defendants' scheme to entrench the Newmont Board, and on the additional ground that the dividend constitutes waste.

When briefing and oral argument were scheduled, all parties agreed that the only transaction in issue on the preliminary injunction motion was the street sweep. Although the class plaintiffs had filed an amended complaint which included a claim for relief against the dividend, those plaintiffs' opening brief was addressed solely to the street sweep and did not mention the dividend. Two days later, only hours before the defendants' briefs were to be filed and one day before the oral argument, the class plaintiffs gave notice for the first time that they intended to challenge the dividend. Their supplemental brief on that issue was filed the next day, *i.e.,* the day of the argument. The defendants objected, insisting that they could not (and should not be compelled to) prepare a response in the short time remaining. Without prejudice to that objection, the Court permitted the class plaintiffs to address the dividend issue at oral argument.

The foregoing indicates that the challenge to the dividend was an afterthought. As a procedural matter, it comes too late. But, as a substantive matter, the argument fails as well.

■ The class plaintiffs concede that the dividend does not violate either the Delaware General Corporation Law or Newmont's certificate of incorporation or by-laws. That being the case, this Court can interfere with the Board's decision to pay the dividend only if (a) the dividend was the product of self-dealing and the

directors fail to prove that the dividend is entirely fair, or if (b) no self-dealing is present and the plaintiff is able to prove that the dividend "... cannot be grounded on any reasonable business objective." *Sinclair Oil Corporation v. Levien,* Del. Supr., 280 A.2d 717, 721 (1971). Where the business judgment rule applies (that is, where no self-dealing is shown), the motives for declaring a dividend are immaterial unless the plaintiff can show that the dividend payments resulted from improper motives and amounted to waste. *Id.* As stated by the Delaware Supreme Court in *Gabelli & Co., Inc. Profit Sharing Plan v. Liggett Group, Inc.,* Del.Supr., 479 A.2d 276, 280 (1984), "... before the courts will interfere with the [business] judgment of the board of directors in such matter, fraud or gross abuse of discretion must be shown." *See also, Burton v. Exxon Corporation,* 583 F.Supp. 405, 415 (S.D.N.Y. 1984) (applying Delaware law).

■ In determining the propriety of the $33 dividend, the business judgment rule is applicable because no self-dealing is shown. The dividend is to be paid to all Newmont shareholders in proportion to their stock interest, and the defendants will receive no greater proportionate share than would the minority stockholders. *Sinclair Oil Corporation v. Levien,* 280 A.2d at 721–722. The record discloses no fraud or gross abuse of discretion by Newmont directors, nor has it been shown that the dividend cannot be grounded on any reasonable business objective. To the contrary, the dividend would appear to further several legitimate business objectives of the Newmont Board: (i) it permits shareholders to realize immediately a portion of the corporation's value, (ii) it defeats an unsolicited partial tender offer reasonably regarded by the Board as coercive and not in the shareholders' best interests, and (iii) it induced Gold Fields to restrict voluntarily its stock ownership to 49.9% of Newmont's outstanding shares and its right to exercise its

the impact of the September 20 standstill agreement—as evidence consistent with an entrenchment motive. Although this evidence raises concerns, given the other undisputed facts bearing on the intent question, those concerns are

insufficient to justify a conclusion of improper motivation on the present preliminary injunction record. The effect of such conflicting evidence is to raise a fact issue that must be resolved at trial.

voting power to take control of Newmont, possibly to the detriment of public stockholders.

Nor is there merit to the claim that the dividend amounts to waste. The class plaintiffs argue that the dividend will leave Newmont with a net deficit in shareholders' equity. But where, as here, a dividend complies with 8 *Del.C.* § 170, the alleged excessiveness of the amount alone does not state a cause of action. *Sinclair Oil Corporation v. Levien,* 280 A.2d at 721. Moreover, the argument ignores the fact that Newmont's nongold assets will be sold in the restructuring and the proceeds will be used to eliminate any temporary deficit.

I now turn to the plaintiffs' remaining arguments, which concern the validity of the street sweep.

### C. The Breach of Fiduciary Duty Claim Under Revlon

Plaintiffs first attack the street sweep as an illegal "lock up" arrangement that violated the Newmont directors' · fiduciary duty to obtain the highest available price for shareholders in any sale of the company. *Revlon,* 506 A.2d at 184. Plaintiffs' argument is that the street sweep, by defeating Ivanhoe's offer and precluding any other offer before any serious competitive bidding for Newmont could begin, foreclosed the auction for control of Newmont required by *Revlon.* Plaintiffs further argue that the Newmont Board's refusal to negotiate with Ivanhoe and its refusal to furnish Ivanhoe with the same information that Newmont supplied to Gold Fields, constituted "playing favorites with the contending factions" that, in these circumstances, was impermissible. *Ibid.*

In *Revlon* the Delaware Supreme Court held that where a corporation that is the target of competing takeover bids is to be sold, its directors' duty becomes one of "maximization of the company's value at a sale for the stockholders' benefit ..." to obtain "the best price for the stockholders at a sale of the company ..." *Revlon,* 506 A.2d at 182. That Court also held that "lock up" arrangements that "draw bidders into the battle" in furtherance of those

objectives are permissible, while those "which end an active auction and foreclose further bidding operate to the shareholders' detriment" and are invalid. 506 A.2d at 183. Moreover, in circumstances where bidders make relatively similar offers or the sale of the company is inevitable, "... favoritism for a white knight to the total exclusion of a hostile bidder" is not permissible. 506 A.2d at 184.

 The plaintiffs' *Revlon* argument is flawed, because it rests upon the infirm premise that the fiduciary obligations imposed by *Revlon* were triggered in the present case. But *Revlon* duties arise only where circumstances make it inevitable that the company will be sold to one of the bidders competing to acquire it. That is not the situation here. At no time did Newmont's directors resolve to sell the company. On the contrary, their steadfast objective was to keep it independent. In this case Gold Fields was not a bidder competing with Ivanhoe to acquire (and thereafter to control) Newmont. Gold Fields was a large investor whose primary desire was to protect its investment in Newmont, not to acquire and operate that company. Gold Fields purchased only enough additional Newmont stock to enable it to fend off the threat that the Ivanhoe offer posed to its investment. (Thus Gold Fields' willingness to enter into a standstill agreement which limited its ability to seize control of the company.)

### D. The "Street Sweep" Coercion and Inside Information Claims

Plaintiffs next attack the street sweep as an independent fiduciary duty violation. They contend that (1) the street sweep was conducted on the basis of material inside information used by Gold Fields but not disclosed to the public or to the selling shareholders and that (2) the selling shareholders were wrongfully coerced by the defendants' acts into selling their shares to Gold Fields. Those contentions are now addressed.

#### 1. The Claim that Gold Fields Used Nonpublic Inside Information

 Plaintiffs contend that Gold Fields, through its two representatives on the

Newmont Board, received confidential information on Newmont that was not disclosed to the shareholders or the public. Plaintiffs argue that (i) Newmont's directors had a duty to refrain from using confidential information obtained by virtue of their director status, (ii) that that duty extended to Gold Fields by virtue of its "insider" status and that (iii) the information divulged to Gold Fields, was also required to be disclosed to Newmont's shareholders. *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983); *Brophy v. Cities Service Co.,* Del.Ch., 70 A.2d 5, 7–8 (1949).

The defendants do not dispute the principles proscribing the use by fiduciaries and insiders of material undisclosed inside information. They dispute only the application of those strictures to the facts of this case. Specifically, the defendants argue that when the street sweep was conducted on September 21 and 22, 1987, whatever material information Gold Fields possessed had already been disclosed to the public. A review of the record persuades the Court that the defendants' position is correct.

The record indicates that from August 18, (once Ivanhoe crossed the 9.9% stock acquisition threshold) up to September 21, (when the street sweep purchases began) Gold Fields received no nonpublic inside information concerning Newmont. During this period Gold Fields' representatives on the Newmont Board did not attend Newmont Board meetings, other than the final portion of the September 20 meeting at which no inside information was disclosed. Specifically, Gold Fields received no valuation information from Newmont's investment bankers during that period.

What inside information Gold Fields did have consisted of budget forecasts for the forthcoming year and for the next five years (2nd Hitchens Aff., Exhibits C, D and E). Those production estimates and financial projections had been furnished to Gold Fields during the spring of 1987 and were not publicly disclosed at that time. The question is whether by the time of the September, 1987 street sweep, any of that information was material and, therefore, should have been disclosed.

By the time of the street sweep, the key assumptions supporting the (pre-August 18) budget forecasts supplied to Gold Fields had significantly changed. Those assumptions—which related to governing Newmont's gold production—were superseded by the revised, more aggressive production assumptions that formed the basis for the Gold Plan. All of those revised assumptions, as well as the Gold Plan itself, were publicly disclosed in the press releases and letter to shareholders dated August 27 and September 1, 1987, and in Newmont's Schedule 14D–9 filed with the S.E.C.

Those being the circumstances, plaintiffs have failed to meet their burden of proving that the undisclosed outdated production and financial forecasts, now obsolete in light of the recent publicly disclosed new Gold Plan forecasts, would have "assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Rosenblatt v. Getty Oil Company,* Del.Supr., 493 A.2d 929, 944–45 (1985); *see also, Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 126–131 (1986). These forecasts, therefore, have not been shown to be material and, as a consequence, a subject of mandated disclosure. Accordingly, the plaintiffs inside information argument must be rejected.

### 2. *The Claim of Unlawful Coercion*

The plaintiffs also contend that this Court should enjoin the street sweep, because it was conducted so as unlawfully to coerce the selling shareholders to sell their shares to Gold Fields. Relying upon the affidavits of several institutions that sold sizeable blocks of Newmont stock to Gold Fields, plaintiffs assert that:

The probable success of Gold Fields' Street Sweep, coupled with the amended Standstill Agreement between Newmont and Gold Fields disclosed on September 21, convinced the market that Ivanhoe's tender offer and acquisition attempt

would be defeated, thereby ultimately driving down the price of Newmont stock. (Sellers Affidavits). The result was a frantic rush to sell Newmont shares to First Boston. That these sales were the result of coercion is clear: many of these holders would not have sold their shares of Newmont but for the fear that the amended Standstill Agreement and the resulting Street Sweep would defeat the Ivanhoe offer. (Ivanhoe Opening Brief, p. 37)

The plaintiffs contend that by facilitating the coercive stock purchases, Newmont's directors breached their fiduciary duties to the selling stockholders, and that Gold Fields (either as an aider and abettor or as a fiduciary in its own right) did likewise.

█ To establish a claim for actionable coercion, plaintiffs must show that the selling shareholders were wrongfully induced by some act of the defendants to sell their shares for reasons unrelated to the economic merits of the sale. *See McFadden Holdings, Inc. v. John Blair & Co.*, Del. Ch., C.A. No. 8489, Jacobs, V.C. (July 2, 1986), at 14–15 [Available on WESTLAW, DE–CS database]. Transactions found to be actionably coercive have included a tender offer structured so as to afford shareholders no practical choice but to tender for an unfair price (see *Kahn v. United States Sugar Corp.*, Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) at 10, 15) [Available on WESTLAW, DE–CS database], and an offer by a corporation for a fair price, but structured and timed so as to effectively deprive stockholders of the ability to choose a competing offer—also at a fair price—that the shareholders might have found preferable. (*AC Acquisitions Corp. v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103, 113–114, (1986)). An offer that is "economically 'too good to resist' would not, for that reason alone, be actionably coercive." *Lieb v. Clark*, Del.Ch., C.A. No. 9012, Jacobs, V.C. (June 1, 1987), at 12 [Available on WESTLAW, DE–CS database].

█ At the time of the street sweep, the following circumstances were matters of public knowledge: the unaffected (pre-Ivanhoe) market price level of Newmont stock had been in the mid to high 40s. (In June, 1987, the stock price was about $45 per share). Both the Gold Fields purchase price (the September 21–22 market price of approximately $98 per share) and the Ivanhoe offering price ($105 per share) included a large premium above previous price levels. Gold Fields owned 26% of Newmont's stock and needed only 23% more to reach 49.9% ownership. Ivanhoe's offering price was higher than the market prices to be paid by Gold Fields, during the street sweep, but the Ivanhoe offer and Gold Fields purchases differed in one very significant respect: a stockholder who tendered to Gold Fields would be able to sell 100% of his holdings immediately for $98. A stockholder who sold to Ivanhoe for $105 could sell only 42% of his shares, with the purchase price to be paid at some later time, and only if the offer succeeded, and with no firm commitment by Ivanhoe to purchase his remaining shares. Finally, the market was informed that Newmont and Gold Fields had entered into the September 20 standstill agreement and that the $33 per share dividend had been declared.

Clearly significant forces of some kind were at work here. In less than two trading days, almost 16 million Newmont shares changed hands. But those sales were driven, at least arguably, by market forces. It seems clear that given a choice between the Ivanhoe and Gold Fields offers, some shareholders would prefer to sell 100% of their shares for an immediate $98 per share, rather than sell 42% of their shares for $105 to be received, perhaps, at a later time. That is, the present record indicates that the "frantic rush" to sell to Gold Fields can be explained in terms of the economic merits of the Gold Fields purchases.

The plaintiffs, however, assert that the selling shareholders sold their stock not in response to economic or market forces but because they were "coerced." To establish that the selling stockholders were actionably coerced, the plaintiffs must prove that the sellers' decision to sell to Gold Fields

was influenced in some material way by a wrongful or inequitable act of the defendants. The plaintiffs make no reasoned effort to meet that burden. At the time of the street sweep the marketplace was aware of only three acts committed by the defendants: (i) the dividend, (ii) Gold Fields' announced intent to make open market purchases of an additional 23% block, and (iii) the September 20 standstill agreement. The dividend was a lawful act. Gold Fields' purchases of additional Newmont stock on the open market were, standing alone, legally proper. The fact that Gold Fields had an advantage over Ivanhoe in terms of ownership (it already owned 26%) and timing (it could purchase the additional 23% immediately, without having to await the conclusion of the federally prescribed tender offer period) were advantages unrelated to and independent of the Ivanhoe offer. Those advantages were not gained by any illegal act or contrivance of the defendants. Those advantages may have created pressure to sell to Gold Fields because of the (accurate) perception that Gold Fields would probably succeed in acquiring 49.9% of Newmont and thereby defeat the Ivanhoe offer. But any such pressure was the result of market forces. No showing has been made that such pressure resulted from any culpable act by the defendants.

Finally, the plaintiffs suggest that the September 20 standstill agreement had an improper coercive effect. The suggestion is also without record support. Although some of the affidavits submitted by certain institutional sellers contain claims of coercion and allude to the standstill agreement, those references are vague and conclusory. The affidavits fail to establish any logical connection between the standstill agreement and the affiants' decision to sell to Gold Fields. Whether the proper expression of the standard for such a nexus be in terms of "causation" or "materiality", under either standard the evidence falls short. That is, the affidavits fail to show either that "but for" the existence of the standstill agreement the selling stockholders would have tendered to Ivanhoe, or that the terms of the standstill agreement

would have been significant to the sellers' decision to sell their stock to Gold Fields (as opposed to tendering it to Ivanhoe). Accordingly, the claim of unlawful coercion must be rejected.

### E. *The Breach of Fiduciary Duty Claim under Unocal*

Finally, the plaintiffs argue that the defendants breached the fiduciary duties set forth in *Unocal,* in resisting the Ivanhoe offer, first by enabling Gold Fields to acquire 49.9% voting control, and second, by "locking up" that control by means of the September 20 standstill agreement.

#### 1.

The standard generally used to evaluate business decisions made by a board of directors is the business judgment rule. However, when a board resists an attempted takeover, there arises "the omnipresent specter that a board may be acting primarily in its own interests rather than those of the corporation and its shareholders ..." *Unocal,* 493 A.2d at 954; *Revlon,* 506 A.2d at 180. Thus, *Unocal* imposes upon directors resisting a takeover bid a dual burden of proof, which they must first satisfy in order to claim the protection of the business judgment rule. First, the directors must prove that they had reasonable grounds for believing there was a danger to corporate policy and effectiveness. That burden is satisfied by a showing of good faith and reasonable investigation. Second, the directors must demonstrate that any measures they adopted in response to the danger were reasonable in relation to the threat posed. *Unocal,* 493 A.2d at 955; *Revlon,* 506 A.2d at 180. Such a showing requires the directors to analyze the nature of the takeover bid and its effect, as well as the effect of the defensive measure, on the corporate enterprise. *Unocal,* 493 A.2d at 955; *AC Acquisitions v. Anderson, Clayton & Co.,* 519 A.2d at 114.

If the directors are unable to meet the burden of proof required by *Unocal,* the Board's actions will not be protected under the business judgment rule. As a

consequence, the directors will have the burden to prove that all aspects of the defensive measure or transaction are entirely and intrinsically fair. In this context the entire fairness test is objective, that is, the fairness of the Board's response to the takeover threat is measured by its objective effect, not by the directors' subjective intent or good faith in adopting the response. *AC Acquisitions v. Anderson, Clayton & Co.*, 519 A.2d at 115.

Application of these principles to the instant facts raises two bedrock questions: (1) Did Newmont's directors reasonably perceive Ivanhoe and Gold Fields as threats to corporate policy and effectiveness? (2) If so, were the defensive measures adopted reasonable in relation to the threat posed? Those questions are now considered in turn.

2.

■ The plaintiffs contend that Newmont should not have considered either Ivanhoe or Gold Fields to be a threat. They argue that Ivanhoe's all cash offer, coupled with its stated intention to provide a "second step" at the same price, was no threat because stockholders could simply choose to accept or reject the $105 and the premium it represented. Plaintiffs further insist that Gold Fields did not constitute a threat, because it did not, in fact, intend to terminate the standstill agreement or to seek to obtain control. Indeed, plaintiffs say, Gold Fields did not have the financial wherewithal to do so, and would have encountered legal obstacles, (including obtaining approvals from the United States Department of Justice, the London Stock Exchange, and its own shareholders) if they attempted to seize control of Newmont.

Plaintiffs assertions are not adequately supported by the record, which shows that both Ivanhoe and Gold Fields posed a threat—reasonably perceived by the directors as such—to Newmont. Those perceptions were the product of a deliberative process, carried out in good faith and by reasonable investigation on the part of the Board. Since the Gold Fields' director-designees did not participate in those deliberations, a majority of Newmont's Board during this critical period were outside, independent directors. The process used to evaluate Newmont's options and the adequacy of the Ivanhoe offer included a series of meetings and discussions among the directors themselves, and also with independent financial and legal advisors. The directors' conclusion that the Ivanhoe offer was inadequate in terms of price, and that there were superior alternatives for shareholders to realize the underlying values in Newmont, were supported by the financial analysis and opinions of those advisors. And their conclusion that the Ivanhoe offer —a two-tier offer having no assured "back end" merger at the same ($105) price—was inadequate, was supported by the *Unocal* decision, which recognized the inherently coercive nature of a two-tier offer that one of the same offerors (Mesa Petroleum) had made two years before. *Unocal*, 493 A.2d at 956.

Nor does the record support plaintiffs' characterization of Gold Fields as a "paper tiger" that posed no threat. Newmont had already experienced one battle with Gold Fields several years before. Newmont's Board had good reason to believe that Gold Fields would not stand idly by and allow its $1 billion investment to be jeopardized by Ivanhoe. The Board knew that at any time after August 18, Gold Fields could terminate the 1983 standstill agreement and then seek to acquire control. In fact, Gold Fields came quite close to doing just that. It had arranged for the necessary financing with First Boston, its Newmont Board-designees had signed (undated) resignations from the Newmont Board, and Gold Fields had prepared a notice of termination of the standstill agreement. These documents were available for delivery to Newmont on short notice. That Gold Fields did not ultimately carry out these plans does not diminish the threat that Gold Fields posed, or the reasonableness of the Newmont directors' perception of that threat.

Ivanhoe, however, assiduously argues that the facts recited in Part II, *supra*, of this Opinion, describing Gold Fields' plans, intentions, and strategies in response to Ivanhoe's offer, are based solely upon the

affidavits of Messrs. Agnew and Hitchens, which affidavits, Ivanhoe contends, are conclusory, self-serving, and inconsistent with contemporaneous notes of Newmont and Gold Fields meetings made during that period. Because of those inconsistencies, Ivanhoe urges that the affidavits not be given probative weight.

I cannot agree. On a motion for a preliminary injunction, the Court will generally refuse to resolve inconsistencies between affidavits and other evidence. Such a determination is normally a matter for a trial. Only in highly limited circumstances might it be justifiable to disregard an affidavit submitted in a preliminary injunction context. *See, e.g., Packer v. Yampol*, Del. Ch., C.A. No. 8432, Jacobs, V.C. (April 18, 1986) at 43 [Available on WESTLAW, DE–CS database] (conclusory statements in affidavits of defendants not credited where affidavits were facially inconsistent with undisputed facts and where defendants had the burden of proof on the issue). Here the affidavits correspond to the undisputed facts, and do not appear to conflict with the notes relied upon by Ivanhoe.

Finally, plaintiffs argue that even if Gold Fields and Ivanhoe did pose a threat to Newmont, the measures employed by the defendants were unreasonable in relation to the threat.

The reasonableness of the defensive measures is separately analyzed, first with respect to Ivanhoe and, second, in relation to Gold Fields. As for Ivanhoe, the defensive measures (the street sweep, the dividend, and the restructuring) appear (preliminarily) to be reasonable, even though their effect would clearly be to block the Ivanhoe offer. The dividend and restructuring have not been shown to be unreasonable responses, because while those transactions might tend to defeat the Ivanhoe offer, they created an alternative benefit for shareholders in the form of immediate cash and, arguably, an opportunity to realize greater long term value on their investment. And although a successful street sweep *would* have the effect of defeating the Ivanhoe offer, that transaction must be viewed as a response by Gold Fields, not by

the Newmont Board. The record indicates that Gold Fields was free after August 18 to terminate the 1983 standstill agreement and to acquire at least an additional 23% of Newmont shares, and that it was, in fact, prepared to do so, irrespective of what the Newmont Board might or might not do. Moreover, Gold Fields could have accomplished this without the dividend. Accordingly, the street sweep was Gold Fields' response to the Ivanhoe threat, not Newmont's. As thus viewed, the response was reasonable, since Gold Fields was at all times free to buy more Newmont stock to protect its existing investment.

In relation to Gold Fields, however, the reasonableness issue is more complex. To eliminate the threat that Gold Fields might seek to gain control (including Board control) of Newmont, it was reasonable for Newmont's directors to seek to limit Gold Fields ability to purchase Newmont stock to less than 50%, and to limit its ability to use its *de facto* controlling voting power to acquire *de jure* control. Therefore, it does not appear unreasonable for Newmont to have insisted upon a standstill agreement that restricted Gold Fields to a 49.9% stock ownership level, that limited its power to elect directors to a ceiling of 40% of the Board, and that imposed reasonable restrictions upon Gold Fields' ability to transfer its stock to a third party free of the standstill agreement. Because Gold Fields' willingness to so restrict itself was conditioned upon the dividend being declared (the dividend itself was lawful, see Part IV B, *supra*), the dividend was also a reasonable defensive measure.

However, it also appears that by using the September 20 standstill agreement as the means to keep the Gold Fields tiger "in the cage," Newmont's directors went too far. The September 20 standstill agreement, as previously noted, bound Gold Fields to vote its shares for the Newmont Board's director-nominees, and it severely restricted Gold Fields' ability to dispose of its Newmont stock free of the standstill restrictions. By thus 'locking up' Gold Fields' 49.9% stock interest, the standstill agreement guaranteed the incumbency

of the Newmont Board (or their designees) and, as a practical matter, assured the defeat of any hostile takeover attempt for possibly ten years. That agreement operated, then, to entrench the Newmont Board. The reasonable goals of limiting Gold Fields' ability to acquire majority stock control (and control of the Newmont Board) did not require, for their accomplishment, entrenching the Board and "locking up" the company. In this respect plaintiffs have shown that they will probably succeed on their claim that those offending provisions made the September 20 standstill agreement unreasonable in relation to the threat posed by Gold Fields.

The defendants argue that even if those contractual provisions were offending at the time of the temporary restraining orders, they are no longer, because Gold Fields and Newmont adopted (post-restraining order) amendments to their standstill agreement, on September 25, 1987. Those amendments assume that Newmont's certificate of incorporation will be amended to authorize cumulative voting. The September 25 standstill agreement limits Gold Fields from voting to elect more than 40% of the Newmont Board. Gold Fields' votes in excess of those needed to elect 40% of the Board would be "passed through" to the independent shareholders of Newmont, *i.e.*, they will be voted in exactly the same proportion as the shares held by the independent shareholders. In effect, the September 25th standstill agreement appears to give the independent stockholders (who own 50.1% of Newmont's stock), the right to elect 60% of the Board, and the power to replace all non-Gold Fields directors.

Regarding restrictions on transfer, the September 25 standstill agreement permits Gold Fields to tender its Newmont shares into any offer for all outstanding shares of Newmont for which the financing is firmly committed, and wherein the offeror undertakes to pay in any second step merger the highest consideration paid under the tender offer. In such a case, Gold Fields must give public notice ten days in advance of its intention to tender its shares.

The September 25th amendments to the September 20 standstill agreement appear to go far towards reducing, if not eliminating altogether, the violations preliminarily found to inhere in the September 20 standstill agreement. But those (September 25) amendments are relevant to the question of remedy, not to the analysis of the reasonableness of the defensive measures under *Unocal*. That analysis is based upon the facts that existed as of the time of the September 21 and 22, 1987 street sweep. Measured as of that time, the "lock up" provisions of the September 20 standstill agreement must be viewed (preliminarily) as an unreasonable response in relation to the threat posed. To that extent, those provisions constituted a violation of the Newmont directors' duties under *Unocal*, in which Gold Fields, as a contracting party that could not have been unaware of the entrenchment effect of those provisions, aided and abetted.

## V. REMEDY

Having found preliminarily that in agreeing to certain provisions of the September 20 standstill agreement, the defendants violated fiduciary duties, the Court must now consider whether the relief requested is an appropriate remedy under the circumstances. The plaintiffs contend that the appropriate remedy is the proposed preliminary injunctive relief that would undo the street sweep. For the reasons discussed below, I cannot agree.

Just as a defensive antitakeover measure cannot be unreasonable in relation to the threat posed, so too, an injunctive remedy should not be disproportionate or excessive in relation to the specific harm that it is intended to prevent:

> But it very often happens that the award of specific relief would inflict a hardship on the defendant which is out of all proportion to the injury its refusal would cause to the plaintiff. In these cases, by the great weight of authority, equity still has discretion in adjusting the relief to be awarded to the needs of the fact situation. *McClintock on Equity*, (2nd Ed.) at page 51 (1948).

That proposition, hardly controversial, is simply a corollary of the broader principle that an injunction must not cause greater harm than it would prevent.

In this case, the irreparable harm to be averted is quite specific. It consists of certain provisions of the September 20 agreement which, if left unchanged, would enable the present Newmont Board to "lock up" voting control and defeat any unsolicited takeover bid. That threatened harm can be prevented by enjoining in some appropriate manner the implementation of the offending provisions in the September 20 standstill agreement. But the corporate defendants have already voluntarily amended that agreement in order to eliminate its offending aspects. As a result, the need for preliminary injunctive relief has arguably been obviated.

To enjoin Gold Fields' now-completed stock purchases is unnecessary. The street sweep was a legally proper transaction that did not, by itself, involve actionable wrongdoing. (See Part IV (D), *supra*) With or without a standstill agreement, Gold Fields would likely have purchased substantial additional Newmont shares on the open market. To require Gold Fields to divest its 23% block of Newmont stock would not only undo an act that was legally proper, and that would likely have occurred irrespective of any standstill agreement, but it would also effectively grant plaintiffs all the relief they might hope to gain after a final hearing. While perhaps a case could arise where justice might require that result, such a result must normally be avoided at the preliminary injunction stage. *Thomas C. Marshall, Inc. v. Holiday Inn, Inc.*, Del.Ch., 174 A.2d 27, 28 (1961); *DiEleuterio v. Pennell*, Del.Ch., C.A. No. 8294, Jacobs, V.C. (December 13, 1985) at 5

[Available on WESTLAW, DE–CS database].

The remaining question is whether, in light of the September 25 standstill agreement, preliminary injunctive restraints are now needed. Although the plaintiffs question the precise legal effect of the September 25, 1987 amendments, at this stage I am satisfied that, with one exception, those concerns do not warrant the imposition of injunctive restraints. The sole *caveat* relates to the ambiguity in the agreement as to whether Gold Fields may designate up to 40% of the Board (and whether the independent shareholders may elect the remaining 60%) prior to the time that Newmont's certificate of · incorporation is formally amended to authorize cumulative voting. That concern can be satisfied if the parties are able (hopefully in the form of order implementing the rulings made herein) to agree upon arrangements that will either preserve the *status quo pendente lite* as it relates to the composition of the Board, or will otherwise resolve the ambiguity in some appropriate manner on an interim basis. Unless and until the Court is advised that the parties are unable to agree upon such interim arrangements, it would not be appropriate to impose preliminary injunctive restraints.

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is denied and the temporary restraining orders previously entered will be vacated. Counsel are requested to submit an appropriate form of order implementing the rulings made herein.